WASHBURN AND MOEN MANUFACTURING COMPANY *vs.* STEPHEN SALISBURY.

Worcester. October 1, 1890. — October 24, 1890.

Present: FIELD, C. J., W. ALLEN, C. ALLEN, & KNOWLTON, JJ.

*Water Rights — Easement — Implied Grant.*

The owners of mill privileges entered into an indenture securing to each privilege an interest in a reservoir as appurtenant to and forever inseparable therefrom, and charging each into whosesoever hands it should pass with a share of maintaining the reservoir. One owner, whose pond as fed by the reservoir was necessary to the successful operation of his mill on its outlet, conveyed the mill lot, describing it by metes and bounds, and excluding the pond and outlet and other land of his beyond the outlet opposite the mill, with the right to draw water from the pond through a six-inch pipe so long as the pond was continued, and to take water from the outlet for mechanical uses. On the same day he leased to his grantee for a term of years all the water of the pond, to be drawn through a flume for manufacturing purposes, at a certain rent, which was paid during the term. The grantor reserved in the deed the right to enter to repair the flume, and to maintain a ram and a pipe upon the premises; and in the lease, the right to take from the pond ice and so much water as would pass through such pipe. *Held*, that the right to have the pond maintained, and to use the water, did not pass to the grantee as an appurtenance under the deed; and that his title was not enlarged by the indenture to include rights not expressly mentioned in the deed.

BILL IN EQUITY, filed January 30, 1890, to settle the water rights of the plaintiff in Salisbury Pond and in North Pond,

in Worcester.    The case was reserved by *W. Allen*, J., for the consideration of the full court, and was as follows.

In 1834, Stephen Salisbury, senior, the father of the defendant, built the Grove Mills, so called, on his land on the east side of Grove Street, in Worcester, and on the southerly side of a non-navigable stream called Mill Brook.    He also built a dam across the brook, and created a pond on his own land on the westerly side of Grove Street, which was called Salisbury Pond.    A flume was built by him, about two hundred feet southerly of the brook, to conduct the waters of the pond to the mills where it was used.    These mills were continuously leased by him, from October 1, 1834, to July 1, 1868, the waters of the pond being always necessary to run the mills, to wash the wire manufactured there, and for other purposes.    In November, 1849, he entered into an indenture with other owners of mill sites for the purpose of maintaining North Pond, which was above Salisbury Pond, as a reservoir, and, as expressed in the preamble, " so as to enjoy the benefits thereof to the best advantage."    The mills and privileges were " to be considered as separate and distinct properties and estates in construing and applying this instrument," and the use and benefit of the reservoir was to be so annexed to each of their respective mills and estates " as to render them appurtenant to and forever inseparable from the same."    In this indenture these mill-owners agreed and covenanted each with the other, that they would purchase the pond and maintain it forever for the use of their several estates, and enlarge it, if they should see fit, at the common charge; that each should contribute proportionally to the purchase money, and to the expense of maintaining, repairing, or enlarging it; that the reservoir, so far as its use and benefit was concerned, should be appurtenant to the estate of each, and should never be " separated or divided, nor aliened nor disposed of separate or distinct," forever; that none of them should draw more water than what should be agreed upon, or at a different time, or in any different manner; that each one's personal liability should continue only so long as he remained an owner; and that any purchaser of an estate should take it charged with the payment of sums properly incurred on account of the reservoir property, each estate to be held and bound for the payment

thereof into whosesoever hands it should come.  Provisions were inserted for incorporating the proprietors, if they should see fit, for reservoir purposes.  A conveyance followed from each to the others of all his right, title, and interest in and to his mill property, including land sufficient for the enjoyment and occupation thereof, to secure the carrying out of the covenants of the indenture, which conveyance, however, was to be void if each owner kept and performed all the covenants or agreements therein contained.  Then followed provisions for the entry of any estate for breach of condition, etc., and for fixing the proportions of ownership in the reservoir property and of the payments to be made by and under the indenture.  Subsequently, in March, 1850, the owners named in the indenture purchased North Pond, which ran into Salisbury Pond by an outlet one and three quarters miles long, and Stephen Salisbury, senior, became the owner of a fractional part of the water therein.

On September 30, 1865, Stephen Salisbury, senior, conveyed to the plaintiff a lot of land on the east side of Grove Street, to the south of the land on which the Grove Mills stood, with the right to the plaintiff " to draw water, with the natural flow of the same, from the pond on the east side of said Grove Street, through a pipe of the diameter of one and one half inches, to the lot herein conveyed, and with the right to drain from the lot above conveyed through Prescott Street to the raceway of said Grove Mills, so long as a cesspool in the drain shall be made and kept in order sufficient to detain solid substances from passing into said raceway, and if such cesspool is not kept in order, this right shall cease."  On July 1, 1868, Stephen Salisbury, senior, who still owned his share in the North Pond reservoir, gave to the plaintiff a warranty deed, in the usual form, of land constituting the Grove Mills estate, describing it as bounded by Grove Street on the west; by Mill Brook, the north face of the south wall of which was made the boundary, on the north; by Prescott Street on the east; and on the south, by the land previously conveyed by the grantor to the plaintiff by the deed of September 30, 1865; " together with the buildings, machinery, and other property on the lot hereby conveyed. And said Salisbury doth grant as aforesaid the right to discharge

sewage through the tail-race of the mill as at present, and also into the brook north of the lot hereby conveyed, provided a cesspool shall be made and kept clear in each and every sewer, and provided there shall be no direct discharge from a privy into the stream. And said Salisbury doth further grant, as aforesaid, a right to draw water from Salisbury's pond, to the land above conveyed, through a six-inch pipe, by the natural flow of the water, so long as said pond is continued, and also a right to take water from the brook on the north line of the lot hereby conveyed, for mechanical uses. And said Salisbury doth reserve for himself and his heirs and assigns a right to enter the lot hereby conveyed at the northwest corner thereof, at the south side of the flume at the bridge, for the repair of the flume, doing as little damage to the grantees, their successors and assigns, as possible; and also a right to lay down and maintain a pipe of six inches bore from Salisbury's pond through the lot hereby conveyed to Prescott Street, without damage to the grantees; and also a right to maintain and keep in repair for twenty years a water-ram, as at present, on the lot hereby conveyed."

On July 1, 1868, Stephen Salisbury, senior, also by an instrument under seal, leased to the plaintiff " all the water in Salisbury Pond," on the west side of Grove Street in said city, "to be used for manufacturing purposes through the flume at the south end of the dam, subject to the reservations hereinafter expressed. And said Salisbury reserves to himself, his heirs and assigns, during the term of this lease, the right to take ice from the pond as heretofore, and the right to convey so much water from said pond, through the lot this day conveyed to the lessees, to land on Prescott Street, as will pass through a pipe of the bore of six inches. And said Salisbury doth promise that he will maintain the dam at Salisbury Pond at its present height at least, during the term of this lease." Here followed a description of a small lot on the west side of Grove Street, bounding on the pond, called the " barn lot," also leased to the plaintiff. " To hold for the term of twenty years from the day of the date hereof, subject to the agreements and reservations herein stated, the Washburn and Moen Manufacturing Company yielding and paying therefor to said Salisbury, at his house, as annual rent, the sum of one hundred and fifty-one dollars on the

first days of July in each year during the term of this lease. And it is agreed by the parties that the above rent is made up of one hundred and fifty dollars for rent of the barn lot, and one dollar in addition to the considerations connected with the sale of the Grove Mills estate to the lessees, this day, for rent of the water. And in consideration thereof the said Washburn and Moen Manufacturing Company do hereby promise to pay the annual rent as aforesaid, on the days appointed. And the lessees do further agree to keep in good repair the flume and gates at the south and north end of the dam of Salisbury Pond. And the lessees do further agree to pay to said Salisbury so much money as he shall pay as the proportionate share belonging to Grove Mills of any expense of care and repair of North Pond dam, during the term of this lease."

The deed of July 1, 1868, did not cover all the land lying east of Grove Street belonging to Stephen Salisbury, senior, but he still owned land other than that conveyed, opposite the pond and north of the brook, as well as to the east of the land conveyed, across Prescott Street, which was available for manufacturing purposes in connection with the waters of the pond. During the term of the lease, the plaintiff continued to occupy and enjoy its land for the manufacture of wire and other materials, and to use and avail itself of the waters of Salisbury Pond and of North Pond, paying the rent therefor stipulated in the lease. Meanwhile, the plaintiff had substituted steam for water power, but the waters were as advantageous and necessary as ever to supply its condensers, to wash the wire manufactured by it, and for various other purposes.

The plaintiff contended that all the water rights acquired by Stephen Salisbury, senior, in the North Pond, and the right to use the water of Salisbury Pond for the Grove Mills, passed to the plaintiff by the deed of July 1, 1868. The defendant, who was the only heir at law of Stephen Salisbury, senior, and had succeeded to his title, denied the claim of the plaintiff, and threatened to prevent the plaintiff from asserting any right in the waters of Salisbury Pond, or of North Pond save such as it might have to draw water through the one and a half and six-inch pipes specified in the deeds to the plaintiff of September 30, 1865, and of July 1, 1868, respectively.

*W. S. B. Hopkins & T. G. Kent, (G. T. Dewey* with them,) for the plaintiff.

*F. P. Goulding & R. Hoar,* for the defendant.

KNOWLTON, J. The plaintiff claims a right to use the water of Salisbury Pond, and of the reservoir above, called North Pond, for power and other purposes connected with its mill, which it bought of Stephen Salisbury, senior, by a deed bearing date July 1, 1868. It appears that the use of this water, or of a similar quantity from some other source, is necessary to the successful operation of the plaintiff's manufactory in the manner in which it has been used. The plaintiff claims an easement created by an implied grant, and contends that the right to have the pond maintained, and to use the water, passed to it as an appurtenance under its deed.

The doctrine under which easements are held to be created by an implied grant rests upon the principle, that the intention of the grantor is to be discovered by an application of the language of his grant to the subject matter to which it relates. If upon the whole instrument he appears to have intended to convey an easement by implication, the easement is held to have passed. All the rules which have been established in regard to this subject depend on this principle. A grant of a mill or of a dwelling-house ordinarily includes all such privileges in other land of the grantor as are necessary to the enjoyment of the thing granted. This is because, in the absence of anything to show the contrary, the grantor will be presumed to have so intended; but if in the instrument he negatives such an intention, the rule does not apply.

In the case at bar, the parties seem to have been particular to make their meaning clear. In the first place, the real estate is described by metes and bounds, and all parts of the pond and of the brook are carefully excluded. The deed next defines the water rights which are created by it. The plaintiff is given a "right to draw water from Salisbury's Pond to the land above conveyed, through a six-inch pipe, by the natural flow of the water, so long as said pond is continued, and also a right to take water from the brook on the north line of the lot . . . for mechanical uses." The grantor then reserves rights in the land conveyed, which have reference to the maintenance and use of the pond

for a time for his own purposes.   He retains a right to enter the lot at the northwest corner thereof, at the south side of the flume at the bridge, for the repair of the flume, and a right to lay down and maintain a pipe of six inches bore from Salisbury Pond through the premises to Prescott Street, and also a right to maintain and keep in repair for twenty years a water-ram as then used on the lot conveyed.. If there were nothing in the case but this deed to show the intention of the grantor, there would be strong ground for contending that he gave the plaintiff no rights in the pond except those expressly stated.   But the parties went further.   On the same day, and as a part of the same transaction, another instrument was made, and the two must be considered together.   The grantor leased to the plaintiff for the term of twenty years "all the water in Salisbury Pond," to be used for manufacturing purposes in connection with the property conveyed by the deed, subject to a reservation of a right to take ice from the pond during the term, and to convey so much water from the pond to the grantor's land on Prescott Street, through the lot conveyed by the deed to the plaintiff, as would pass through a pipe of the bore of six inches.   In the same instrument he leased another lot near by, the annual rent for the whole to be one hundred and fifty-one dollars, made up of one hundred and fifty dollars for this lot, " and one dollar in addition to the considerations connected with the sale of the Grove Mills estate to the lessees, this day, for rent of the water."

The pond was created artificially, not far from the centre of the city of Worcester, where the land covered might be expected to become valuable for other uses.   The two instruments taken together show plainly that the grantor did not intend to give the plaintiff a right to have the pond permanently maintained.   The right expressly given to draw water through the six-inch pipe was limited to the time that the pond should be continued, thus implying that the grantor might at any time discontinue it. But as a part of the bargain, the grantor was willing, by the lease, to give the grantee a right to use the pond for twenty years.   At the expiration of that time the plaintiff's rights in it would cease if it should be discontinued, and would be limited to the flow through the six-inch pipe if it should be maintained. The subsequent conduct of both parties shows that they cor-

rectly understood the meaning of these instruments; for the rent for the use of the pond was paid by the plaintiff to the end of the twenty years.

While it was the intention of the parties to the indenture of November 24, 1849, as between themselves, permanently to connect their several rights in North Pond with their respective mills and privileges, they were not thereby precluded from carving up their several estates by deeds of sale in any way which they should choose, subject to the continuance of any incumbrance upon them which may have been created by the indenture. The title of the plaintiff is not enlarged by the indenture to include rights which are not embraced in the language of the deed. Whether, under any circumstances, rights created by the indenture could be enforced by other parties against the estate in the plaintiff's hands, is a question which it is unnecessary to decide.

We are of opinion that the plaintiff acquired no rights in the waters of Salisbury Pond except those expressly mentioned in its deed.                    *Bill dismissed, with costs.*