EDWARD A. BIGELOW, administrator, *vs.* LAWYERS MORT-
GAGE INVESTMENT CORPORATION OF BOSTON & others.

Suffolk.    May 13, 1946. — September 25, 1946.

Present: FIELD, C.J., QUA, RONAN, & SPALDING, JJ.

*Mortgage Company. Bills and Notes,* Indorser, Holder in due course.
*Mortgage,* Of real estate: "mortgage certificates." *Contract,* Con-
struction. *Lien. Accord and Satisfaction. Receivership. Res Judicata.*

Under the terms, read together, of coördinated documents, a "deposit
agreement" whereby a mortgage company deposited with a bank
mortgage notes indorsed by the company in blank, and mortgage
certificates sold by the company to investors and purporting to convey
to each purchaser an "undivided interest" in the notes, — the docu-
ments requiring the company to maintain on deposit with the bank
at all times notes of an aggregate amount equal to the aggregate face
amount of the certificates and sufficient to produce interest at a stated
rate thereon, to collect and distribute interest at that rate, and in effect
to pay the certificate holders the principal amounts of the certificates
at specified times, but reserving to the company the right to withdraw
and substitute notes and to collect and retain all principal on the notes
and to retain all interest in excess of the stated rate, and providing
that no certificate holder should be entitled to possession of any de-
posited note or to have his specific interest set apart, — the certificate
holders did not become holders in due course of the notes nor did the
company's indorsement of the notes have the ordinary effect of an
indorsement of a promissory note; and in a receivership of the com-
pany the certificate holders were not entitled to prove for the full
unpaid amount of the principal and interest of the deposited notes
on the theory that the company was liable to them as indorser, but
were restricted to proving for only the principal of their certificates
and the stated interest thereon.
On facts pertaining to a mortgage company in liquidation which, as agent
for holders of certificates sold by it, had a claim against its wholly
owned subsidiary respecting mortgage notes and mortgages acquired
by it from the subsidiary and deposited by it with a bank as security
for the payments to be made on such certificates, and which also had
a claim against the subsidiary respecting other mortgage notes and
mortgages acquired by it from the subsidiary and not so deposited
but held by it as its own "free" assets, a certain sum received by it
in a liquidation of the subsidiary on account of the "free" notes and
mortgages was not subject to an equitable lien in favor of the certificate
holders as against the mortgage company's other creditors, but was
its general asset available ratably to all its creditors in its liquidation.

A certain agreement among the creditors of a title company in receiver-
ship, including a mortgage company of which the title company was a
wholly owned subsidiary and a bank to which the mortgage company
had pledged notes acquired from and indorsed by the title company,
applied only to the creditors' claims in that receivership, and the agree-
ment and payments made to the creditors thereunder did not operate
as an accord and satisfaction determining for the purposes of a receiver-
ship of the mortgage company the question of the validity of such
pledge and the question of the right of the bank to claim therein as a
secured creditor of the mortgage company; nor did decrees in the
receivership of the title company approving the agreement and order-
ing distribution of assets in accordance therewith make such questions
res judicata in the receivership of the mortgage company.

BILL IN EQUITY, filed in the Supreme Judicial Court for
the county of Suffolk on June 14, 1943, for the appointment
of a receiver of the defendant Lawyers Mortgage Invest-
ment Corporation of Boston.

A receiver was appointed. Subsequently he filed a peti-
tion for instructions, which was reserved and reported by
*Qua,* J.

*A. L. Hyland,* for the receiver, stated the case.

*W. A. Powers,* for certificate holders.

*S. H. Babcock,* (*W. Malcolm* with him,) for The First
National Bank of Boston.

*R. C. Williams, Jr.,* for New England Mutual Life Insur-
ance Company.

*G. K. Richardson,* for John Hancock Mutual Life Insur-
ance Company, submitted a brief.

QUA, J. The receiver appointed by this court for Law-
yers Mortgage Investment Corporation of Boston, herein-
after called the mortgage company, reports that substan-
tially all the assets of that company have now been turned
into liquid form, and requests the determination by the
court of several questions of law which must be settled
before distribution can be made.

The material facts have been agreed upon among the
parties interested and in so far as is necessary will be re-
ferred to later in dealing with the particular issues. It may
be stated here, however, that prior to the year 1933 the
mortgage company was engaged in the business of acquir-
ing real estate mortgages, depositing them with a depositary

bank and selling to dealers in securities insured first mort-
gage certificates, so called, certified by the bank.  The
method of operation was this.  The mortgage company was
the sole owner of a subsidiary corporation known as Lawyers
Title Insurance Company, hereinafter called the title com-
pany.  The title company lent money to owners of real
estate on their negotiable notes secured by mortgages.  It
then sold these mortgages at face value for cash to the mort-
gage company.  The title company indorsed the notes and
assigned the mortgages to the mortgage company and also
issued to the mortgage company insurance policies insur-
ing both the validity of the titles and the sufficiency of the
mortgages.  A large proportion of the notes and mortgages
was deposited by the mortgage company with The First
National Bank of Boston, hereinafter called the bank, as
depositary under the terms of certain deposit agreements
between the mortgage company and the bank under which
it was the duty of the bank, in general, to receive and hold
in its custody the deposited notes and mortgages and to
"certify" and deliver the certificates to the mortgage com-
pany, but only to such amounts that the aggregate face
amount of the certificates of any series at any time outstand-
ing should not exceed the aggregate principal amount of
the mortgage notes deposited and held in the custody of the
bank for the benefit of holders of certificates of that series,
and to keep a record of such certificates.  The deposit agree-
ments also provided that deposited mortgage notes might
be withdrawn from deposit by the mortgage company from
time to time, provided that the mortgage company always
maintained the aggregate principal of the deposited notes at
a sum at least equal to the aggregate face amount of the
outstanding mortgage certificates issued with respect to
such mortgages.  Upon depositing the notes and mortgages
with the bank, the mortgage company indorsed the notes in
blank but did not execute assignments of the mortgages.
The insurance policies were also deposited.  The mortgage
company then sold the certificates.  In each certificate the
mortgage company purported to sell to the certificate holder
an "undivided interest" in the deposited mortgage notes

proportionate to a specified amount called the "face amount" of the certificate, and covenanted with him that the aggregate principal amount of the deposited notes should always be at least equal to the aggregate face amount of the outstanding certificates; that it would at all times maintain with the depositary an aggregate of deposited mortgage notes sufficient to produce interest at five (or five and one half) per cent on the face amount of the outstanding certificates; that it would distribute such interest semiannually; and that ten years after the date of the certificate or upon the death of the certificate holder (and in some certificates upon the termination by the death of a beneficiary of a trust holding the certificate) it would "buy" the certificate from the registered holder at a "price" equal to its face amount with interest, less all amounts previously distributed to the holder. The mortgage company also had an option to buy before the expiration of ten years. There were provisions which in effect compelled the certificate holder to sell to the company corresponding to the company's covenant to buy at the expiration of ten years or to the exercise of its option to buy at an earlier date. The form of the certificates was incorporated in the deposit agreements, and the certificates referred to those agreements and were expressly made subject to them. It is plain therefore that the contracts between the mortgage company and the certificate holders are to be found in both the certificates and the deposit agreements, which must be read together.

The whole plan was intended to provide a method by which purchasers of certificates might acquire the benefit of investment in specified proportions in a group or pool of deposited real estate mortgages of which the investors were to have no immediate possession or control and which might be changed from time to time at the will of the mortgage company, but which at all times while the certificates remained outstanding must be sufficient to make secure the principal of the investment and the interest thereon. This plan was closely similar to the plan under which were issued the "first mortgage certificates" described and discussed in *Commissioner of Insurance* v. *Con-*

*veyancers Title Ins. & Mortgage Co.* 296 Mass. 556, 560–563. See also the same case in 300 Mass. 457, 461–462, 470–471.

1. The first question upon which the receiver desires instruction relates to the proper formula for determination of the claims of holders of the certificates.

The certificate holders, the total face amount of whose certificates, after distributions of principal already made but without interest, has now, according to the facts agreed, been reduced to $664,036.21, contend that they became owners in common of all the deposited mortgage notes in the several series respectively; that they are still such owners, except as to notes that have been paid in full or properly withdrawn from deposit; that the mortgage company guaranteed payment of the principal and interest of the notes when it indorsed them in blank at the time of depositing them with the bank; and therefore that the certificate holders of the respective series as holders in due course of the notes, because of the indorsement of the notes, have provable claims against the mortgage company to the amounts of unpaid principal and interest of all the notes deposited in those series, except those paid in full and those properly withdrawn from deposit. Other creditors contend that the certificate holders can prove only for the unpaid face amounts of their certificates and interest.

We cannot accept the theory of the certificate holders because the existence of any liability of the mortgage company as indorser of the notes to the certificate holders as joint indorsees is inconsistent with the express provisions of the underlying documents by which the whole plan of investment was set up and governed. We pass without discussion any possible difficulty as to whether the certificate holders ever became holders of the deposited notes within the meaning of G. L. (Ter. Ed.) c. 107, § 18, to whom an indorser would be liable under § 89, or as to want of presentment and notice to charge the indorser in accordance with §§ 93, 112, or as to what extent the "indorser" has been relieved in accordance with §§ 142 and 143 by payments by the makers or otherwise, and we come directly to the documents. The mortgage certificates contain pro-

visions that the mortgage company "retains" the right to all interest paid on the deposited notes in excess of the rates named in the certificates; that all interest shall be collected by the mortgage company for the benefit of certificate holders to the extent of their interest, the mortgage company to retain the excess for its own use; that the mortgage company "retains" the right and is declared to be and is "irrevocably appointed" the "exclusive" agent and attorney of the certificate holders to receive, collect and sue for the interest and principal of the notes, to decide when and how to enforce any provisions of the notes and mortgages and in its own name to enforce the same, and in all respects to pursue any remedies which any owner of the notes might pursue; that the mortgage company may retain for its own use any payments of principal on any deposited notes; that the mortgage company may itself be the holder of certificates; and that only the mortgage company may collect interest and principal on the deposited notes. The deposit agreements further provide that upon the withdrawal from deposit of any note by the mortgage company all right, title, and interest of certificate holders therein shall terminate and shall vest in the mortgage company; that no certificate holder shall be entitled to the possession of any deposited note or to any setting apart of his specific interest; and that only the mortgage company shall have the right to collect either interest or principal of any deposited note. We are unable to see how a group of persons who are not entitled to possession of the notes, whose interest in any note can be terminated at the will of the mortgage company, and who have no power to sue upon the notes can as indorsees have rights of action against the mortgage company as indorser, when that company has the irrevocable and exclusive power to collect and sue upon the notes, the right to retain part of the interest for its own use, the right to retain for its own use any payment at any time of principal on any particular note, and the right to "vest" in itself full title to any note upon the conditions that the remaining notes shall still be capable of producing the required interest and that their

total face value shall still equal or exceed the total face amounts of the outstanding certificates.

Moreover, the result of allowing certificate holders to prove claims for all unpaid principal and interest on deposited notes would be to hold the mortgage company liable to certificate holders for a sum vastly greater than the total face amounts of the certificates and interest — a result apparently at variance with the whole plan of the instruments under which the certificates were issued. According to that plan, in the due course of its operation, the only way in which a certificate holder could secure repayment of his capital investment was through the "buying" by the mortgage company of his certificate at "maturity," and he was then to receive only the face amount with interest and without other increment.

Whatever rights the parties may have intended the certificate holders to have in the deposited notes cannot have included the right to hold the mortgage company as indorser on these notes. The indorsements and deposits of the notes were not transactions independent of the deposit agreements and of the mortgage certificates. They were clearly in pursuance of the deposit agreements and the certificates. The certificate holders were not holders in due course of the notes. G. L. (Ter. Ed.) c. 107, § 75, cl. 4, § 80. They were participants in the entire enterprise evidenced by the deposit agreements, the certificates, and the notes. The present issue is in effect between original parties to the deposit agreements and the certificates, all of whom were aware of the provisions contained in these papers. As between these parties all the instruments must be read together. *Jewett* v. *Tucker*, 139 Mass. 566, 575. *Washburn & Moen Manuf. Co.* v. *Salisbury*, 152 Mass. 346, 351–352. *Skilton* v. *R. H. Long Cadillac LaSalle Co.* 265 Mass. 595. *Mayo* v. *Fitchburg & Leominster Street Railway*, 269 Mass. 118, 121. *Charlestown Five Cents Savings Bank* v. *Zeff*, 275 Mass. 408. *Baker* v. *James*, 280 Mass. 43, 46–47. *Lamson & Co. (Inc.)* v. *Abrams*, 305 Mass. 238, 240. *Bielanski* v. *Westfield Savings Bank*, 313 Mass. 577, 580. Williston on Contracts (Rev. ed.) § 628. When this is done it is seen

that the indorsements on the notes are not to be given the ordinary effect of indorsements on negotiable instruments. The indorsements are controlled and modified by the express terms of the other instruments.

The view we have just expressed as to the rights of proof of certificate holders is confirmed rather than shaken by the provisions of a "Plan of Adjustment," sometimes called the "standstill agreement," dated February 28, 1933, and assented to by more than ninety-eight per cent of the certificate holders, as modified August 1, 1938, wherein the certificates are frankly treated as obligations of the mortgage company at their face amounts and wherein it is provided that all of them will "become due" at a single fixed date, when certificate holders "will have a claim against the Company for the face amount of their certificates," with interest, with certain specified adjustments. But, as hereinbefore indicated, we are of opinion that even as to the nonassenting certificate holders the obligation of the mortgage company for which they are entitled to prove in this proceeding rests upon the breach of that company's covenant to "buy" the certificates at their face amounts with interest, less amounts previously distributed, as provided in the certificates.

It follows that the receiver should be instructed that the holders of insured first mortgage certificates have not the right to prove against the mortgage company in receivership for the difference between the total face amount of the mortgage notes deposited and the amount realized thereon; but that their right to prove is limited to the unpaid face amounts of the certificates and interest as stated therein.

2. The second question propounded by the receiver relates to the proper disposition of the sum of $113,989.95 (now slightly larger by reason of accumulations) received by the mortgage company in a previous liquidation by receivers of its wholly owned subsidiary, the title company.

Only a few large creditors and the holders of certificates from the mortgage company as a group were interested in the liquidation of the title company.[1] Their claims arose

---

[1] The possible existence of a few trade creditors to a trifling amount is now of no importance.

out of the original indorsement of mortgage notes by the title company and the issuance by it of insurance policies guaranteeing the sufficiency of the mortgages.    There were complicated and difficult issues among them as to the amounts of their claims against the title company, as a result of which prolonged litigation seemed likely.    Consequently all of them joined in a written agreement called the hotchpot agreement by which all of their claims were placed in a single pool from which each was to receive as a fair settlement of his claim an agreed percentage of the total sum payable on all the claims, whatever that total sum might turn out to be. All of the parties to the present suit became bound by this agreement.    The mortgage company signed in two capacities, first as the attorney for its certificate holders, under the power contained in the certificates, with respect to claims upon indorsements and insurance policies guaranteeing the sufficiency of mortgages deposited with the bank upon which certificates had been issued, and secondly on its own account with respect to indorsements and insurance policies guaranteeing the sufficiency of mortgages not so deposited but held by the mortgage company as its own "free" assets. Later, in the receivership of the title company, after notice and hearing, a single justice of this court entered a decree adjudging that the mortgage company was exclusively entitled to prove in behalf of the certificate holders their claims against the title company; that the mortgage company had authority to execute the hotchpot agreement in behalf of the certificate holders and had executed it in good faith in their behalf; that the agreement was fair and equitable and was approved; that the receivers of the title company make distribution according to the agreement among the parties thereto; and that the mortgage company hold all moneys received as proceeds of claims made in behalf of certificate holders in trust for their benefit, subject to the further order of the court.    Under this decree the mortgage company received as attorney for the certificate holders the sum of $319,602.19, which by subsequent decree of the court was allocated among the holders of certificates of the several series.    The mortgage company also received on its own

account the further sum of $113,989.95. The receivers of the title company have had allowed their final account showing these payments and have been discharged. The certificate holders of the mortgage company now contend that the last mentioned sum should, like that first mentioned, be appropriated exclusively to their claims against the mortgage company in the present proceeding. Other parties contend that this sum is simply a part of the general assets of the mortgage company available for distribution ratably among all creditors of the mortgage company, including certificate holders.

The argument of the certificate holders, as we understand it, is this: The mortgage company was the exclusive agent of the certificate holders to collect for them the deposited notes and any amounts due on the accompanying insurance policies issued by the title company. The title company was under the absolute control of the mortgage company and was a mere instrumentality of that company. The mortgage company, instead of collecting from the title company on the insurance policies applicable to deposited notes to an amount larger than the sum now in dispute when it could have done so, failed to make such collection until the title company went into receivership. If the mortgage company had made the collection from the title company of the insurance claims of the certificate holders, the assets of the title company would have been so far exhausted that to continue the title company in business as provided in the Plan of Adjustment, and as it was in fact continued, the mortgage company would have been obliged to transfer to the title company, in order to maintain the latter's guaranty fund and restore its capital as required by G. L. (Ter. Ed.) c. 175, § 69, the mortgage company's "free" mortgage notes to an amount at least greater than the $113,989.95, which the mortgage company received from the title company on account of the latter's indorsement and insurance of the "free" notes. In this way the "free" notes, as the certificate holders argue, could and should have been used to provide for the payment of claims of the certificate holders against the title company, and so (as

they argue) "the proceeds of . . . [the free notes, being the sum of $113,989.95,] in the hands of the mortgage company, which failed in its duty to the certificate-holders and profited at their expense, should be charged with an equitable lien" in favor of the certificate holders.

Even if we assume all the basic facts upon which this argument must rest, although some of them can hardly be said to be established on the record before us and others are profoundly affected by other facts which do appear and are not referred to in this argument, this line of reasoning discloses unbridged gaps, and in our opinion the conclusion that the certificate holders have an equitable lien upon the sum of $113,989.95 is a non sequitur. If we recognize, as we think we should, the separate existence and identity of the title company, it seems plain that the history of the origin of this sum now in the hands of the receivers of the mortgage company as outlined at some length above shows that certificate holders never had in the beginning or at any stage acquired any lien or prior claim upon the source from which this sum was derived or upon the sum itself. It is clear that the mortgage company held and by the plan of its operation was expected to hold mortgage notes which were not deposited and in which certificate holders had no interest. These notes, as well as the deposited notes, were secured by the indorsements and policies of the title company, but the certificate holders had no claim upon the title company in respect to any indorsements or policies pertaining to undeposited notes. They had no priority in the assets of the title company for their claims with respect to deposited notes over the claims of others with respect to undeposited notes. Throughout the settlement of the affairs of the title company the claims with respect to indorsements and policies pertaining to these two classes of notes were kept separate. All parties concerned, including the certificate holders through their representatives, recognized this situation and joined in agreements by which obligations relative to the two classes of notes were kept separate. The sum of $113,989.95 was clearly the sole product of claims against the title company with respect to the

undeposited notes or "free" assets of the mortgage company. Before this sum was paid to the mortgage company the certificate holders had no special claim upon the assets of the title company out of which the payment was made, and after the sum was paid to the mortgage company it became general assets of that company in which the certificate holders had no rights greater than those of other creditors of the mortgage company. The special right or lien of the certificate holders was fully recognized as to the larger sum of $319,602.19 which was the product of claims against the title company pertaining to the deposited notes, but the lien did not extend beyond that sum. If it be true (which in the circumstances we are far from asserting) that the failure of the mortgage company to enforce the liability of the title company was a breach of the mortgage company's fiduciary duty to its certificate holders, that circumstance might give rise to a cause of action in favor of the certificate holders against the mortgage company, but we know of no principle of law that the wrongful failure of a trustee to assert a right held in trust gives the beneficiary a lien in priority to other creditors upon general assets of the trustee not belonging to the trust. Even where the trustee has misappropriated trust property, the prior claim of a beneficiary is bounded by the assets of the trust and their identifiable proceeds. *Lowe* v. *Jones*, 192 Mass. 94. *Salem Elevator Works, Inc.* v. *Commissioner of Banks*, 252 Mass. 366, 372. *Worcester Bank & Trust Co.* v. *Nordblom*, 285 Mass. 22, 25. *Farinha* v. *Commissioner of Banks*, 303 Mass. 192, 195–196. If, on the other hand, we were to take the view urged upon us by the certificate holders that the title company was so far a mere instrument of the mortgage company that its separate existence can be disregarded (a view which we do not take), the result would be the same. In that view we suppose the assets of the title company would be treated as assets of the mortgage company and claims of one company against the other might be disregarded, but it would still be true for the reasons above stated that the sum of $113,989.95 and the sources from which it came had always been general assets of the mort-

gage company and not assets held in trust for the certificate holders, and that the certificate holders would have no lien upon it.

The receiver should be instructed that the sum of $113,989.95, with its accumulations, is held as general assets for distribution among all creditors, including certificate holders, but without priority as to them.

3. Further questions have arisen relative to collateral given by the mortgage company to secure a note originally for the sum of $575,000 given by it to the bank upon which the bank seeks to claim as a secured creditor of the mortgage company.

The mortgage company borrowed this sum from the bank in a series of loans and later pledged as collateral mortgage notes with a total face value of $797,175, but then estimated to be worth about $555,000. Some of the creditors of the mortgage company, including certificate holders, now contend that this pledge of collateral was invalid on the ground that some of the pledged notes had been wrongfully withdrawn by the mortgage company from the lists of deposited notes against which certificates had been issued, and that others were wrongfully pledged because they ought to have been deposited to fulfill the mortgage company's obligations to certificate holders; and that consequently it is the duty of the bank to return this collateral to the receiver and the duty of the receiver to compel it to do so, and that the bank is entitled to prove for the amount of its note only as an unsecured creditor.

In this connection the receiver alleges that in his opinion a full trial of the issue of the bank's right to acquire this collateral would involve great labor and expense, which might be obviated if the court would now determine whether, as the bank contends, any claim of the receiver to recover the pledged mortgage notes and any claim that they are not security for the note held by the bank is barred (1) by the hotchpot agreement and the payments made under it operating as an accord and satisfaction of all conflicting claims among the parties interested, and (2) by the decrees confirming the hotchpot agreement and ordering distribu-

tion under it operating as res judicata. The hotchpot agreement and these decrees have already been described briefly in this opinion.

(1) There is nothing in the hotchpot agreement that amounts to an accord and satisfaction as among creditors of the mortgage company with respect to the bank's right or lack of right to hold the pledged notes as security. The agreement does not establish the validity of the pledge of the notes for the bank loans. It does not touch that matter. It is a mutual compromise of the competing claims of creditors of the title company. It seems that in treating the bank to some extent as a creditor of the title company the parties must have taken into account the fact that the bank claimed to have a security title in the pledged notes and hence a right to recover against the title company as indorser and insurer of those notes. But this claim was compromised rather than admitted or established by the agreement. Moreover, the agreement was a compromise only of the competing claims of the parties against the title company. No language of the agreement goes beyond this, and it contains language which we think was intended expressly to limit it to this. The hotchpot agreement was not a compromise or accord of the claims of the several parties against the mortgage company with which alone this present proceeding is concerned. The claims against the two companies, although related to the extent that payments realized upon claims against the title company might have to be credited on claims against the mortgage company, were otherwise distinct and rested upon different causes of action. See *Lee* v. *Tarplin*, 183 Mass. 52, 55. It follows that the hotchpot agreement and payments received in accordance with it do not constitute a defence by way of accord and satisfaction against a present claim by creditors of the mortgage company or the receiver of that company that the pledge of the collateral with the bank is invalid.

(2) The decrees of this court in the title company receivership approving the hotchpot agreement and ordering distribution of the title company's assets in accordance with it went no farther than the agreement went. They approved

the agreement only for what it was — a settlement of competing claims upon the title company's assets. They did not determine the distribution of the mortgage company's assets. Neither did they establish facts which are determinative in the distribution of the mortgage company's assets. See *Foye* v. *Patch*, 132 Mass. 105, 110–111; *Watson.* v. *Berman*, 302 Mass. 305, 307; *Whittemore* v. *Selectmen of Falmouth*, 304 Mass. 72, 74; *Hopkins* v. *Holcombe*, 308 Mass. 54, 57; Am. Law Inst. Restatement: Judgments, § 68 (2), and comments d to i, inclusive. The only facts they established of possible materiality here were that the mortgage company had authority to act for its certificate holders, and did so act in good faith; that the parties had made the agreement relative to their claims against the title company; and that it was a fair and equitable agreement for the distribution of the title company's assets. These decrees are not res judicata as to the bank's right to hold the pledged notes in the present proceeding.

The receiver should be instructed that the hotchpot agreement and payments made in pursuance of that agreement do not operate as an accord and satisfaction establishing the right of the bank to hold the pledged notes as security for its loan to the mortgage company, and that the decrees approving the hotchpot agreement and providing for payment in accordance with that agreement do not operate as res judicata establishing the right of the bank to hold such security. The decree should state, however, that it decides nothing more as to the right of the bank to hold the security than the two propositions just expressly stated, and that it is wholly without prejudice in any other respect to the bank or the receiver or the certificate holders or creditors of the mortgage company on the issues of the bank's right to acquire and to retain this security.

The receiver asks a further question as to the disposition of any sum he may recover from the bank. This question has not been argued and is of importance only in a contingency that has not yet occurred. We think it should not be answered now. One or two other questions more or less related to those herein decided have been suggested.

rather than distinctly placed before us for decision and have been argued by some of the parties but not by others. A careful examination of the record convinces us that we have dealt with all issues plainly presented for decision which ought to be decided at this time.

A final decree upon the receiver's petition is to be entered by the single justice in accordance with this opinion, and the cause in general is to stand for further proceedings in the county court not inconsistent with this opinion.

*So ordered.*