COMMISSIONER OF INSURANCE *vs.* CONVEYANCERS TITLE INSURANCE AND MORTGAGE COMPANY & others.

Suffolk. November 10, 1937. — June 3, 1938.

Present: FIELD, DONAHUE, LUMMUS, QUA, & DOLAN, JJ.

*Contract,* Construction. *Mortgage Company. Mortgage,* Of real estate: "parti-mortgage receipt," "mortgage certificate." *Receiver.*

"Parti-mortgage" receipts and mortgage certificates issued to investors by a corporation engaged in lending money on mortgages of real property and interests therein were intended not only to create contractual rights but also to establish and define property rights which the company as well as the security holders should have in the underlying mortgages, and such rights continued to exist in their essential substance in the settlement of the affairs of the corporation by receivers appointed under § 6, as amended by St. 1933, c. 107, § 3, and § 114 of G. L. (Ter. Ed.) c. 175.

Under the provisions of certain "parti-mortgage" receipts issued to investors by a corporation for money which it lent upon mortgages, promising to pay the investors as interest a certain sum less than that payable to it as mortgage interest, receivers of the corporation were not entitled to deduct the difference between the two interests as a prior claim upon proceeds of the underlying mortgages; but they were entitled to retain for their general funds, as a net profit, any excess of interest which they might collect from the underlying mortgages over the amount necessary to pay the principal and interest named in such receipts.

Under provisions of an agreement making a readjustment of claims of holders of "parti-mortgage" receipts issued by a mortgage corporation when it found itself in need of money not subject to prior claims and available for general use, by which there was placed in trust with the corporation all interest received from underlying mortgages after

deducting the difference between the interest called for by the receipts and that payable under the underlying mortgages and the corporation was given the right to retain that difference for its own use, receivers of the corporation were entitled to deduct such difference and add it to their general funds, from interest actually received by them or by the corporation from the underlying mortgages; but there was no such right with respect to properties in possession under or purchased in foreclosure of underlying mortgages or as to sums not paid or applied as interest under common law rules, nor in cases where the right to retain the difference had been waived by the corporation.

General expenses of a mortgage corporation which issued "parti-mortgage" receipts to investors of money which it lent on real estate mortgages, incurred by it in the management of mortgages and mortgaged properties, and of its receivership, could not be specially allocated to and charged against certain receipt holders whose securities were not chargeable with the difference between the amount payable to the corporation as interest on the underlying mortgages and that promised under their receipts.

Advances made by a mortgage corporation from its general assets to pay taxes and other current expenses of maintenance and operation of properties mortgaged to it properly might later be deducted by receivers of the company from funds collected in liquidation of the mortgages and might be paid into the general assets rather than applied toward satisfaction of the corporation's guaranty of investments made by holders of "parti-mortgage" receipts, where it appeared that the receipts provided for deduction of "all reasonable and proper charges" by the corporation before distributing the money collected among the receipt holders and gave it full control of the underlying mortgages; but under the terms of certain receipts issued under a readjustment agreement, such deduction of advances could not be made from sums received as interest; nor did the receivers have such right as to holders of certain receipts which required a repurchase by the company in five years and contained no such provision as to charges.

Under "parti-mortgage" receipts, issued by a mortgage corporation against a stated mortgage held by it, providing that, in case of a receivership, an obligation of the corporation to repurchase "shall forthwith become due and payable," a receiver of the corporation, after liquidating the mortgage debt and making lawful deductions, was required to distribute the net proceeds to holders of such receipts *pro rata* and to disregard other provisions of the receipts respecting optional repurchase before their maturity.

RECEIVERSHIP PROCEEDINGS in the Supreme Judicial Court for the county of Suffolk relating to Conveyancers Title Insurance and Mortgage Company.

The case was reported by *Lummus*, J., after a hearing upon a report and petition by the receivers.

*G. Alpert,* (*J. W. Kelleher & L. R. Cohen* with him,) for the receivers.

*H. LeB. Sampson,* (*E. A. Howes, L. Patrick, & J. J. Kaplan* with him,) for Charles Francis Adams & another, trustees, and others.

*H. Williams,* (*R. M. Russell & J. D. Dow, Jr.,* with him,) for Martha O. Batchelder and others, trustees, and others.

*P. D. Turner,* for Caroline M. Conant.

QUA, J. This cause is again here for the determination of certain questions of law which arise upon a report of the receivers and upon a petition by them that the court make rules governing the settlement of the affairs of the respondent corporations pursuant to the provisions of G. L. (Ter. Ed.) c. 175, § 6, as amended.

The former decision, reported in 296 Mass. 556, sufficiently describes the nature of the business carried on by the respondent Conveyancers Title Insurance and Mortgage Company, hereinafter called the Company, and its wholly owned subsidiary, the respondent Realty, Inc. The general character of the parti-mortgage receipts and of the mortgage certificates, which together constitute the "securities" issued or sold by the Company to its investors, and of the deposit agreements with the depositary bank also appears therein. These matters will be repeated or amplified here only in so far as may be necessary to make clear the grounds of the present decision or to indicate certain differences in the terms of the various classes of parti-mortgage receipts and mortgage certificates which were not of consequence when the case was here before, but which become material now. The word "seigniorage," which was used at the hearing before the single justice and which it may be convenient to use in this opinion, refers to a sum equivalent to the difference between the interest payable upon a mortgage held by the Company at the rate named therein for any period and the interest payable for such period on the securities issued with respect to such mortgage at the rate (commonly a lower one) named in such securities.

The questions now reported for decision, reduced to their

lowest terms, may be stated as follows: (1) To what extent, if at all, may seigniorage be deducted by the receivers from the income derived by them from mortgages or properties foreclosed or in possession which are subject to parti-mortgage receipts or mortgage certificates and added by the receivers to the general funds in their hands? (2) If no seigniorage may be deducted, may the receivers deduct reasonable charges for services in managing such mortgages and properties or for administration expenses of the receivership, or both, from the proceeds of such mortgages and properties before distributions are made to the holders of the receipts and certificates? (3) To what extent, if at all, should the receivers deduct advances made prior to the receivership by the Company or its subsidiary for taxes upon and expenses of maintenance and operation of properties which, or the mortgages upon which, are subject to parti-mortgage receipts or mortgage certificates? (4) Should principal collected on mortgages with respect to which mortgage certificates are outstanding issued under a deposit agreement dated September 15, 1932, and cash received from the sale of property held subject to said agreement be used for the purchase of mortgage certificates on tenders as provided in Article II, Section 3, of said agreement, or should such principal be distributed *pro rata* to the certificate holders?

For convenience in this litigation the parti-mortgage receipts have been divided into classes A to F and the mortgage certificates into classes G and H, the classification depending upon the particular form of receipt or certificate and deposit agreement (if any) in use at the time of issuance. The parti-mortgage receipts comprising classes A to E, inclusive, recite (1) that the Company has received the money of the investor "in purchase of a parti-interest" in a designated mortgage note and provide (2) that the note is to remain in the name of the Company, which shall have as full and complete powers in reference thereto as if it were the absolute owner thereof; (3) that the net proceeds of the note or notes, after deducting all reasonable and proper charges, are to be held for and distributed

among the security holders; (4) that the Company insures the owner of the receipt against loss from any cause of his principal investment and against loss of interest at the rate mentioned in the receipt; and (5) that failure of the receipt holder to receive principal or interest on the due date shall be conclusive evidence of loss. Mortgage certificates of class G contain substantially equivalent recitals and provisions adapted to the different situation which exists where the security is issued with respect to a group of mortgages instead of a single mortgage (see *Commissioner of Insurance* v. *Conveyancers Title Ins. & Mortgage Co.* 296 Mass. 556, at page 561), the Company binding itself in effect to repay the principal by repurchasing the certificate at its face value five years after its date. Parti-mortgage receipts of class F and mortgage certificates of class H were both issued in pursuance of a "Plan of Readjustment" which was accepted by more than ninety per cent of all receipt and certificate holders and which went into effect as of September 15, 1932. Receipts and certificates of these classes contain the recitals and provisions hereinbefore numbered (1) and (2) and various further terms to which reference will be made later.

Without further discussion of the details of the several classes of receipts and certificates, but giving careful attention to their wording, arrangement and purpose as well as to the several deposit agreements which are incorporated by reference in the receipts and certificates, we are of the opinion that these instruments were intended not only to create contractual rights but also to establish and define property rights which the Company as well as the security holders should have in the underlying mortgages. See *Commissioner of Insurance* v. *Conveyancers Title Ins. & Mortgage Co.* 296 Mass. 556, 563. In general these property rights, whether they are treated as arising by way of a trust in which the Company and the investors are alike *cestuis que trust*, or as arising by way of several and differing legal interests created in the same security, or as partaking in various aspects of each of these characteristics, continue to exist in their essential substance, notwith-

standing default by the Company in its contractual obligations and after the appointment of the receivers and must be accorded appropriate recognition in the rules, orders and decrees governing the administration of the receivership. *Jennings* v. *Whitney*, 224 Mass. 138. *Antoine* v. *James E. Nelson Co.* 265 Mass. 214, 218. *Chamberlain Garages, Inc.* v. *New England Bond & Mortgage Co.* 267 Mass. 453. See *Commissioner of Insurance* v. *Conveyancers Title Ins. & Mortgage Co.* 296 Mass. 556, 565. Compare *Matter of People (Title & Mortgage Guarantee Co. of Buffalo)* 264 N. Y. 69. In our former decision we said that as a result of the statute under which the receivers were appointed and of the decree appointing them "the settlement of the 'affairs' of this Company implies, or at least permits, the substitution of the receivers for the Company in the holding and management of the mortgages for which the receipts and certificates were given, during such period as may seem to the court proper for the liquidation of the Company and the settlement of its affairs." *Commissioner of Insurance* v. *Conveyancers Title Ins. & Mortgage Co.* 296 Mass. 556, 565.

We shall deal in turn with the several questions reported. The answers must depend upon the construction of the pertinent receipts or certificates and deposit agreements in the light of the agreed facts.

1. There is no basis for the deduction by the receivers of seigniorage at a fixed percentage as a prior claim upon the proceeds of mortgages which underlie the receipts and certificates of classes A, B, C, D, E and G. All of these were issued prior to the plan of readjustment of 1932, and the holders of the few which are now outstanding did not accept that plan. We do not understand that the receivers now seriously dispute this point. Indeed, from the literal wording of the pertinent instruments it could be argued that the holders of securities of these classes (except class G) were entitled to the entire proceeds of the mortgages, principal and interest, "after deducting all reasonable and proper charges" incurred in the preservation and protection of particular mortgages. However, it

is stated in the agreed facts that each receipt in every class contains "the rate of interest payable to the holder," and it appears to have been the settled practice of the Company to pay to receipt holders interest at that rate. We think there is enough to show the right of the Company, and now of the receivers, to retain for their general funds any excess of interest which they have succeeded or may succeed in collecting from the relative mortgages as a net profit over and above the amount required to pay the principal of the parti-mortgage receipts and interest at the rate named therein. In no other sense are the receivers entitled to deduct seigniorage with respect to classes A, B, C, D and E. Their rights are similar as to class G.

Parti-mortgage receipts and mortgage certificates of classes F and H stand in a different position. By far the greatest proportion of outstanding securities belong to these classes. These securities were issued to security holders who accepted the plan of readjustment of 1932 and are in accordance with the deposit agreement which accompanied that plan. The plan had its origin in the general conditions then confronting holders of real estate mortgages. The Company found itself in need of a substantial sum of money not subject to prior claims of particular security holders, but available for general use in carrying defaulted mortgages and foreclosed properties. Evidently it was thought that all the security holders could fairly be asked to aid in the creation of such a sum for the mutual benefit of all, whether or not at the moment the particular mortgages relative to their particular securities were in distress. Accordingly, the parti-mortgage receipts and mortgage certificates issued under the plan bore rates of interest reduced by one per cent. The receipts (class F) contained a new clause providing that all interest received from the underlying mortgage note, "after deducting the difference between the rate of interest payable on the Parti-Mortgage Receipts outstanding with respect to said note and the rate payable on said note, which difference the Company shall be entitled to retain for its own use, shall be held in trust by the Company for the pro-rata benefit of the holders of

all relative Parti-Mortgage Receipts, and shall be paid to such holders on the interest dates herein provided." It was further provided that if the interest so held in trust should be insufficient to pay the interest due on the relative receipts, the amount so held should be distributed *pro rata* among the receipt holders, and that the difference between the amount so distributed and the interest provided in the certificate should be paid by the Company in one year from the due date. In order to make sure that the interest money which the Company was thus permitted to retain should redound to the ultimate benefit of security holders, it was provided that no dividends should be paid or distribution made to stockholders of the Company until the receipts should be paid in full or otherwise cancelled, and until a warrant to be issued to the holder for an amount representing the one per cent reduction in interest should also be paid. The certificates issued under the plan (class H) contained similar provisions.

The purpose and effect of these changes were, we think, to alter the respective property rights of the security holders and the Company in the interest accruing from the underlying mortgages by taking away from the security holders in part the direct and immediate security of the accruing interest on the relative mortgages and giving the seigniorage to the Company as a prior claim upon that interest to be added to the Company's general assets, thus providing free cash which could be used for the protection of any mortgages which had fallen or might fall into default, and of which any balance remaining would also be available ultimately for all claims, by far the largest part of which would be claims of the security holders, to all of whom the Company continued to be liable. And in spite of considerations to the contrary we incline to the view that the Company's property right in the seigniorage was not impliedly conditional upon its continued performance of its contractual obligations either as to payment of the interest or of the face amount of its securities. Such a condition would render the peculiar seigniorage provision largely ineffectual to accomplish its apparent object. The papers

were obviously drawn with great fullness and care. No such condition is expressed in them. The Company is to retain the seigniorage out of "all interest received" and "for its own use." Security holders who accepted the plan of readjustment knew that the Company was then unable to meet its contractual obligations. There is nothing to prove that they were deceived into surrendering their rights. It follows that the receivers should deduct seigniorage with respect to securities of classes F and H from interest received by them or by the Company and from interest to be received upon the relative mortgages to the extent indicated in the parti-mortgage receipts and the mortgage certificates and should add the amounts so deducted to their general funds.

But under the terms of the receipts and certificates seigniorage is to be deducted only from interest received on deposited mortgage notes, including, in the case of the certificates, any mortgage note legally deposited in substitution for those originally deposited. There is no provision for seigniorage on net income from properties foreclosed or in possession. In fact the deposit agreements pertinent to classes F and H, the only classes here involved, declare without qualification that acquired properties are to be held for the benefit of security holders. No facts are shown from which any right to seigniorage should be implied beyond that expressed in the papers. Provisions in the declarations of trust given by the Company to the depositary relative to foreclosed properties purporting to reserve seigniorage out of net income therefrom seem to us in conflict with the controlling instruments and not binding upon security holders in the absence of consent or acquiescence on their part. For similar reasons seigniorage cannot be deducted from any payments by mortgagors which under the common law rules relating to application of payments have been or must be applied to taxes as distinguished from interest. Therefore the receivers are not to deduct seigniorage from the net income of foreclosed properties or properties in possession or from sums not paid or applied under common law rules as interest, and

any sums heretofore so deducted by them, or by the Company and still capable of identification in the receivers' hands, are to be treated as available for payment of the sums due to holders of the relative securities, except that any net income from property in possession before foreclosure which must be credited to the mortgagor against interest on the mortgage note is to be treated as interest received on the mortgage note, and seigniorage may be deducted and retained therefrom.

Although the principal reason for allowing seigniorage under the plan of readjustment seems to have been to provide the Company with funds for carrying charges for the general benefit, we do not perceive in the documents any absolute requirement binding the Company to deduct seigniorage in every possible instance. The words are, "shall be entitled to retain for its own use." We think that the Company, before the appointment of the receivers, could waive seigniorage, thereby reducing the amount of its ultimate liability to the investor. If, as some of the parties assert, the Company before the receivership paid over to security holders interest received on deposited notes without deduction for seigniorage, such payment would, in the absence of special circumstances, constitute a waiver of the Company's right. The receivers are not now entitled to reclaim seigniorage with respect to any receipts of interest as to which the Company waived its right to seigniorage.

2. We interpret the second question reported as referring to charges for general management services such as would commonly be required in caring for a large number of mortgages and properties in possession or foreclosed and to the general expenses of administering the receivership. We do not understand that it refers to expenses particularly applicable to specific mortgages or properties. One purpose of this question seems to be to obtain a decision as to whether any part of the general expenses can be specially allocated to and charged against the holders of such securities as are not chargeable with seigniorage. In our opinion no such charges can be made. It is not customary in a receivership

to assess general management and administration costs upon or to apportion them among creditors, whether secured or unsecured. There is no provision in the contracts or in the statute for any service charge. In a sense the security holders as well as the Company benefit from the efforts of the receivers in the preservation of the assets in which all have an interest. But the security holders did not seek the receivership and enjoy no such special and distinct benefit as has sometimes been held to justify imposing expenses of a receivership upon secured creditors. *Turner* v. *State Wharf & Storage Co.* 263 Mass. 92, 96, 97.

3. The word "advances" in question 3 we understand to refer to such items as taxes, insurance, repairs, water rates and other current expenses of maintenance and operation which were reasonably paid or "advanced" by the Company from its general assets or by its subsidiary for the protection or preservation of particular mortgages or properties. It is urged that the receivers cannot now restore these advances from the proceeds of the mortgages or properties thus benefited to their general funds for the reasons that the Company has fully insured or guaranteed its security holders; that an insurer or indemnitor who is thus primarily liable will not be subrogated to the disadvantage of his indemnitee or permitted to compete with him for a share in the security; and that the security holders are entitled in equity to set off their rights against the Company to be protected from loss against any right of the Company or its receivers to reduce the security by reclaiming the advances. We need not discuss the general principles thus involved. They are not disputed. They are illustrated in *J. H. McNamara, Inc.* v. *McGuire,* 254 Mass. 589, *Jenkins* v. *National Surety Co.* 277 U. S. 258, *American Surety Co.* v. *Westinghouse Electric Manuf. Co.* 296 U. S. 133, and *Louisville Title Co.'s Receiver* v. *Crab Orchard Banking Co.* 249 Ky. 736 (a case bearing some resemblance to the case at bar). But those principles must yield to the terms of the governing legal instruments by which the parties have seen fit to bind themselves, if those instruments provide otherwise, as we think they do, though

with some qualifications, and except as to one class of securities.

The parti-mortgage receipts of classes A, B, C, D and E, after giving to the Company the full and complete powers of an absolute owner over the underlying mortgages, including that of exercising the power of sale and in general of doing anything and everything customary and proper for a mortgagee to do, provide that the net proceeds of the mortgage notes, "after deducting all reasonable and proper charges," shall be held for and distributed by the Company among the receipt holders. We think that the "reasonable and proper charges" which may be deducted include the advances, which are thus made a charge upon the proceeds of the mortgage notes, principal and interest, and upon the proceeds of foreclosed properties. It is difficult to see what was meant by these words unless it was intended that the Company, though an insurer and bound as such to make good the face value of the receipts in due time, should nevertheless have rights of reimbursement in the first instance with respect to expenses incurred to preserve or to enforce the underlying mortgages.

The receipts of class F, which were issued under the plan of readjustment, taken in connection with the accompanying deposit agreement, give to the Company similar powers over the mortgages. They provide that all interest received from the notes, after deducting seigniorage, shall be paid to receipt holders, but payments of principal or the proceeds of sales of mortgaged property are to be paid over "after deducting all reasonable and proper charges." The deposit agreement provides that the Company shall deliver to the depositary "a suitable declaration of trust" covering acquired properties for the benefit of receipt holders. The declarations of trust delivered in pursuance of this provision allow the Company to reclaim its advances. In view, however, of the express requirement that all interest received from the notes (after deducting seigniorage) shall be paid to receipt holders, we think that as to securities of this class advances are not recoverable out of in-

terest, but are chargeable only against principal and the proceeds of sales of mortgaged property.

The certificates of class H do not mention any deduction of reasonable and proper charges. But they also give to the Company full control of the mortgages. They, too, were issued under the plan of readjustment, and the accompanying deposit agreement provides that acquired property shall be held in trust for certificate holders, and that a "suitable declaration of trust" shall be held by the depositary. The declarations of trust so held provided for reimbursement of the Company for advances. We cannot say that such a provision was not "suitable." Reimbursement for new money put into the properties for their benefit is not inconsistent with the holding of the properties in trust for certificate owners. It is consistent with the purposes of the plan of readjustment. The receivers should deduct advances as to class H from the proceeds of acquired properties held in trust. But for the same reason as in the case of class F, advances may not be reclaimed out of interest from the original mortgage notes.

Class G remains. The documents pertaining to certificates of this class do not mention advances. The deposit agreement states that the Company shall have the right to withdraw from deposit any deposited mortgages and to retain for its own use any payments of principal on any deposited notes, "provided" that it "shall at all times comply with" its covenant as to the aggregate principal amount, interest rate and character of the relevant deposited notes and mortgages. Without entering upon a discussion as to the effect of this clause in general, it is difficult to find in it any authority such as is found with respect to the other classes allowing the Company to recoup itself for advances as such out of the avails of property now standing as security, in competition with its creditors and in derogation of the rule hereinbefore stated. We conclude that the receivers may not deduct advances made prior to the receivership pertaining to certificates of class G.

All deducted advances are to fall into the general funds

in the receivers' hands. These results as to advances seem to us consistent with the terms of the documents, the nature of the several kinds of securities, the plan of readjustment (in so far as that plan is involved) and, at least in most respects, with the established practice, of the Company.

4. The fourth question relates only to mortgage certificates of class H. Each certificate provides in substance for its purchase by the Company either at its due date or upon call at a price equal to its "face amount" with any unpaid interest, and that in the event of the appointment of a permanent receiver the Company's obligation to purchase "shall forthwith become due and payable." The pertinent deposit agreement contains a clause to the effect that the Company shall hold payments of principal collected on deposited mortgage notes in trust for certificate holders and shall apply the amount of such payments to the purchase of outstanding certificates which it may call by lot at the next interest date or it may at its discretion request tenders of such certificates and may apply the money "to the purchase at the lowest prices offered, not in excess of the face thereof, of the largest amount of such certificates that can be so purchased." In our opinion this clause of the deposit agreement must be construed as intended to apply only to payments of principal made before the certificates fall due upon particular mortgages included in the group of mortgages which underlie the relevant certificates. The form and structure of the instruments leave this construction possible. It would be a most unusual procedure to select for payment by lot or by competitive tenders a few certificates out of a whole series all of which were equally due and payable in full. Such methods are especially inappropriate in the conduct of a receivership, the purpose of which is to secure fair and proportional distribution of available assets. The tender method would require certificate holders to guess at their peril as to the amount which would ultimately become distributable and as to how low other certificate holders might bid. It might result in those who esteemed their certificates least valuable getting the lion's share of the security. Or it might

result that some holders would receive practically face value for their certificates while others received little or nothing. On the other hand there is nothing essentially unreasonable in these provisions, if they are construed to apply to payments received before the certificates become due when no holder may demand payment as of right. At all events we cannot believe that the parties intended to project these schemes into the situation created by a receivership. We think that upon the appointment of permanent receivers the wording of the certificates themselves became operative, and the Company's agreement to "purchase" the certificates (in effect, to pay them) "forthwith . . . [became] due and payable." See *American Loan & Trust Co.* v. *Northwestern Guaranty Loan Co.* 166 Mass. 337, 342, 343. We answer that the collected principal and cash referred to in question 4, after deducting advances when such deduction is permissible, should be distributed *pro rata* to the holders of the relative mortgage certificates.

Pursuant to the terms of the report a decree is to be entered embodying the foregoing determinations, and the decree entered May 28, 1937, and the rules therein promulgated and prescribed are to be modified in conformity thereto.

*Ordered accordingly.*