THE DELAWARE AND HUDSON COMPANY *vs.* BOSTON RAILROAD HOLDING COMPANY & another.

Suffolk.   April 4, 1951. — November 9, 1951.

Present: QUA, C.J., LUMMUS, RONAN, SPALDING, WILLIAMS, & COUNIHAN, JJ.

*Boston Railroad Holding Company. Guaranty. Release. Corporation,* Liquidation, Reorganization, Stockholder. *Bankruptcy,* Corporate reorganization. *Equity Pleading and Practice,* Decree, Anti-trust proceeding. *Judgment. Estoppel. Sale,* Of stock. *Lien. Words,* "In any liquidation."

A guaranty by The New York, New Haven and Hartford Railroad Company of payment of dividends and of par value in liquidation on the so called publicly held preferred stock of the Boston Railroad Holding Company did not entitle such stock to priority in distribution upon dissolution of the holding company over preferred stock held by the railroad company where it appeared that the railroad company had been released from its guaranty by a consummation decree of a United States District Court entered in a proceeding for reorganization of the railroad company under § 77 of the bankruptcy act and discharging it generally from all its "obligations, debts and liabilities."

A decree of a United States District Court in an anti-trust proceeding against The New York, New Haven and Hartford Railroad Company and the Boston Railroad Holding Company, providing that "the right attaching to" the so called publicly held preferred stock of the holding company to priority over the preferred stock held by the railroad company "in any liquidation" of the holding company should not "be diminished or impaired," merely recognized and confirmed an existing priority arising from a previous guaranty of the publicly held preferred stock by the railroad company and did not purport to create a priority which would survive when, many years after such decree, a consummation decree entered in a proceeding for reorganization of the railroad company under § 77 of the bankruptcy act released the railroad company from the guaranty and thus eliminated it as the basis of the priority; COUNIHAN, J., dissenting.

The record did not show that in a dissolution of the Boston Railroad Holding Company The New York, New Haven and Hartford Railroad

Company, whose conduct had recognized the existence of a priority of the so called publicly held preferred stock of the holding company over the preferred stock held by the railroad company while that priority existed, was estopped from denying the existence of the priority after the basis thereof had been eliminated.

In dissolution of the Boston Railroad Holding Company, the so called publicly held preferred stock thereof was not entitled to priority over the preferred stock held by The New York, New Haven and Hartford Railroad Company by reason of the mere fact that the railroad company, having originally acquired all the preferred stock, which to the amount of its par value and unpaid dividends was a lien on and secured by certain property of the holding company, had sold the publicly held preferred stock.

It would be contrary to St. 1910, c. 639, § 2, to recognize in a dissolution of the Boston Railroad Holding Company a claim, made by The New York, New Haven and Hartford Railroad Company as a creditor of the holding company, that it was entitled to an equitable lien on certain shares of the Boston and Maine Railroad acquired by the holding company by means of loans from The New York, New Haven and Hartford Railroad Company long after issuance of the preferred stock of the holding company had been authorized.

PETITION, filed in the Supreme Judicial Court for the county of Suffolk on December 7, 1949.

The case was reserved and reported by *Ronan,* J., without decision.

The case was argued in April, 1951, before *Qua,* C.J., *Lummus, Spalding,* & *Counihan,* JJ., and afterwards was submitted on briefs to all the Justices except *Wilkins,* J.

*H. D. McLellan,* (*H. V. Atherton* with him,) for the petitioner.

*J. L. Hall* & *R. Wait,* (*J. M. Howe, Fourth,* with them,) for the respondent The New York, New Haven and Hartford Railroad Company.

*E. O. Proctor,* receiver, pro se.

SPALDING, J. This is a petition filed in the Supreme Judicial Court by The Delaware and Hudson Company, hereinafter called the petitioner, seeking a determination of the rights of certain shareholders of the Boston Railroad Holding Company (hereinafter called the holding company) in connection with the proceedings in dissolution of that corporation pursuant to St. 1946, c. 518. The New York, New Haven and Hartford Railroad Company, hereinafter

called the New Haven, filed an answer, as did also the receiver.[1] A single justice of this court reported and reserved the case without decision on the pleadings and statement of agreed facts, from which it is agreed inferences of fact may be drawn. The holding company is a Massachusetts corporation created by St. 1909, c. 519, as amended by St. 1910, c. 639. The reasons for its incorporation are set forth in *Codman* v. *New York, New Haven & Hartford Railroad,* 253 Mass. 144, 145–146, *Hurley* v. *Boston Railroad Holding Co.* 315 Mass. 591, 595–596, and *Delaware & Hudson Co.* v. *Boston Railroad Holding Co.* 323 Mass. 282, 283–284.[2] The New Haven is a corporation organized and existing under the laws of this Commonwealth and of the States of Connecticut and Rhode Island. Many of the facts underlying its multiple incorporation will be found in *Attorney General* v. *New York, New Haven & Hartford Railroad,* 198 Mass. 413, 418–420.

To a proper understanding of the issues here involved it is necessary to set forth at some length the facts surrounding the formation of the holding company and the relations of that company with the New Haven. The holding company was created by St. 1909, c. 519, "for the sole purpose of acquiring and holding the whole or any part of the capital stock, bonds and other evidences of indebtedness of the Boston and Maine Railroad, and of voting upon all certificates of stock so acquired and held, and of receiving and collecting dividends and interest upon said stock, bonds and other evidences of indebtedness" (§ 1). Section 3 provided that the stock of the Boston and Maine Railroad (hereinafter called the Boston and Maine) which might be acquired by the holding company should not be sold by it without express authority from the Legislature, and that the bonds, notes or other evidences of indebted-

---

[1] An order of notice was issued by the court ordering the petitioner, among other things, to send a copy of the notice by registered mail to all stockholders of record of the holding company and to publish the notice in a Boston newspaper once a week for three successive weeks.

[2] See also the special message of the Governor, Acts & Resolves, 1909, pages 965–966.

ness of the Boston and Maine which might be acquired by the holding company were not to be sold, transferred, pledged or otherwise disposed of without the approval of the board of railroad commissioners. Section 4, so far as material, reads, "Any railroad corporation incorporated at the date of the passage of this act under the laws of this commonwealth may guarantee the principal of and the dividends and interest upon the capital stock, bonds, notes and other evidences of indebtedness of said Boston Railroad Holding Company, and may acquire and hold said stock, bonds, notes and other evidences of indebtedness: provided, however, that the shares of stock of said Boston Railroad Holding Company shall not be sold or transferable until said stock has been guaranteed as hereinbefore provided. Any railroad corporation acquiring said stock as hereinbefore provided shall not thereafter sell the same without the express authority of the legislature." And that section further reserved to the Commonwealth the right to take or purchase all the securities of the holding company and provided the means by and the terms upon which this might be done. The acquisition by any railroad corporation of any of the securities of the holding company was to be deemed an acceptance by any such corporation of all the terms and provisions of the act.

By the early part of 1910, by means of transactions which need not be described here, the holding company had become the owner of numerous shares of the various classes of stock of the Boston and Maine, and the New Haven had become the owner, directly or beneficially, of 31,065 shares of the outstanding common stock of the holding company. The common stock was the only stock having voting power and the shares acquired by the New Haven constituted all of that class of stock.

By St. 1910, c. 639, § 1, it was provided, "The Boston Railroad Holding Company may, by a vote of a majority in interest of its common or general stockholders at a meeting called for that purpose, issue preferred stock, and from time to time increase the amount thereof . . .: provided,

that the amount of such issue and of every such increase shall be approved by the board of railroad commissioners. The holders of such preferred stock shall, in preference and priority over all other stock of the corporation, be entitled, upon dissolution of the corporation or in liquidation of its affairs, or in case of a default in the payment of any stipulated dividend on said preferred stock, to payment of the par value thereof and accrued dividends thereon, and shall further be entitled to semi-annual dividends, to be paid out of the net profits of the corporation, at a rate to be approved by the board of railroad commissioners, but not to exceed, however, five per cent per annum, which dividends shall be cumulative. Said preferred stock shall not be entitled to participate in any increase or issue of new stock, common or preferred, which may be made by said corporation, [and] shall not have any voting power . . . ." Section 2 of that act provided, "Subject only to the rights of creditors of said Boston Railroad Holding Company existing at the date of the stockholders' meeting at which any of said preferred stock is first authorized, said preferred stock, to the amount thereof at par at any time outstanding, and of all accrued and unpaid dividends thereon, shall be and constitute a charge and lien upon, and be secured by, all stock of the Boston and Maine Railroad at any time held by said Boston Railroad Holding Company."

By § 4 of that act the Commonwealth reserved to itself the right to acquire, by purchase or otherwise, this preferred stock. Subject to this reserved right the holders of a majority of the preferred stock were given the right, in case of a default in the payment of any semiannual dividend upon such preferred stock, to apply to this court for an order for the sale of the Boston and Maine stock in order to. enforce the statutory lien created by § 2. Section 4 also provided that "In case of any such sale, the proceeds thereof shall be applied, after payment of expenses of the sale — first, to the discharge of any claims which existed prior to the date of the meeting at which any of such preferred stock was first authorized; second, to the payment

of all accrued and unpaid dividends to which, by the terms of this act, such preferred stock was entitled to the date of said sale; third, to the payment in full, or if said proceeds are insufficient therefor then to the equal pro rata partial payment, of the par value of said preferred stock, and the balance, if any, of the proceeds shall be paid to said Boston Railroad Holding Company." Section 5 of that act reads: "Any railroad corporation owning any of the common stock of said Boston Railroad Holding Company may acquire, hold, own and sell any of the preferred stock authorized by this act, and may guarantee the payment of the stipulated dividends thereon, and of the par value thereof in case of liquidation or distribution of said Boston Railroad Holding Company, and of any deficiency resulting from a sale under the provisions" of § 4.

In the years 1910 and 1911 the holding company pursuant to the act of 1910 issued 272,939 shares of preferred stock, and these were all acquired by the New Haven. In 1911 the New Haven sold to various members of the public 28,000 shares of this stock, stamping on the certificates therefor the following indorsement: "For value received, The New York, New Haven & Hartford Railroad Company . . . hereby guarantees the payment of cumulative dividends on the shares of stock represented by this certificate at the rate of four per centum (4%) per annum as stipulated in this certificate, and the payment of one hundred dollars ($100) upon each share of said stock in case of liquidation or distribution of Boston Railroad Holding Company and of any deficiency resulting from a sale under the provisions of Section 4 of Chapter 639 of the Acts of Massachusetts of the year 1910." These shares will sometimes hereinafter be referred to as the publicly held preferred stock.

On July 23, 1914, the United States of America brought proceedings in equity under the Sherman anti-trust law (26 U. S. Sts. at Large, 209) in the United States District Court for the Southern District of New York, naming as defendants the New Haven, the holding company, and

others not here involved. The New Haven and the holding company appeared and on October 17 of that year a consent decree was entered, the material portions of which follow. The New Haven was ordered to assign and transfer to named trustees all the shares of common stock as well as its 244,939 shares of preferred stock of the holding company, the latter being at the time the holder of a majority of the shares of the Boston and Maine. Subject to the provisions of the decree and until its purposes had been fully carried out, the trustees were to hold those shares and exercise all the powers which owners of shares of the holding company were entitled to exercise, except the right to sell or otherwise dispose of them. The decree further provided: "As early as may be the trustees shall make proper arrangements to protect the rights of preferred stockholders of the holding company, after which, but not until further order of the court, they shall exercise their powers so that there shall be a sale or sales . . . of all the shares of the [Boston and] Maine . . . owned by the holding company, free from the statutory lien of the preferred shares of the holding company hereby directed to be transferred . . . ." The trustees were to endeavor to complete the sale of the Boston and Maine stock before January 1, 1917. The decree went on to provide that "if the lien of the preferred shares of the holding company on the shares of the [Boston and] Maine . . . has not been released before the final date of sale the trustees shall release the lien in respect of the 244,939 shares of preferred stock of the holding company held by them (substituting therefor a lien upon the proceeds), and shall then cause the said shares of the [Boston and] Maine . . . to be sold . . . subject only to the lien of the 28,000 shares of preferred stock of the holding company held by other persons."

And then follows the clause which has given rise to some of the contentions advanced in this case by the petitioner: "Whenever in their judgment it shall be necessary, the trustees may take proper steps to subordinate the statutory lien enjoyed by the preferred shares of the holding company

held by them to the lien of the 28,000 preferred shares of the holding company held by others; but the lien of the preferred shares held by them shall attach to any proceeds from the sale of the shares of the [Boston and] Maine . . . remaining after satisfying the claims of the persons holding the said 28,000 preferred shares." As soon as practicable the trustees were to cause the dissolution and winding up of the holding company, and the order of distribution of proceeds on liquidation was set forth.

"By subsequent decrees, the period within which the trustees named therein were directed to sell the Boston and Maine stock . . . was extended from time to time. On May 8, 1923, the stock of the Boston and Maine belonging to the holding company . . . was still unsold and said trustees had not released the lien in respect of the 244,939 shares of preferred stock of the holding company held by them and had taken no steps to subordinate the statutory lien enjoyed by the preferred shares of the holding company held by them to the lien of the 28,000 preferred shares of the holding company held by others." It does not appear from the record that this power of subordination was ever exercised.

On May 8, 1923, the New Haven presented to the court a petition for modification of the 1914 decree alleging that, for reasons not here material, the trustees ought to be directed to assign and transfer to the New Haven all shares of the holding company held by them, "provided that the right attaching to the 28,000 shares of preferred stock of the Boston Railroad Holding Company held by other persons, to be preferred in any liquidation of said Boston Railroad Holding Company to the remaining shares of the common and preferred stock of said Boston Railroad Holding Company held by the New York, New Haven and Hartford Railroad Company, shall be in no manner diminished or impaired."

On June 4, 1923, a decree was entered on this petition. It struck out of the 1914 decree the provisions relating to the assignment of the stock of the holding company by the

New Haven to the trustees and the provisions relating to the trustees' duties in connection therewith, "excepting that the right attaching to the 28,000 shares of preferred stock of the Boston Railroad Holding Company held by other persons to be preferred in any liquidation of said Boston Railroad Holding Company to the remaining shares of the common and preferred stock of the said Boston Railroad Holding Company held by the New York, New Haven and Hartford Railroad Company, shall in no manner be diminished or impaired, and the certificates of said 28,000 shares of preferred stock shall be presented at the office of the Boston Railroad Holding Company in Boston, Massachusetts, to be stamped as entitled to such preference." The trustees were ordered to assign, transfer, and deliver all the shares of the common and preferred stock of the holding company held by them to the New Haven, said shares to be held by the New Haven "subject to the provisions of the statutes of Massachusetts, Acts of 1909, chapter 519."

Pursuant to this decree the trustees returned to the New Haven all the shares of the holding company held by them, and at or about this time the holding company caused the following indorsement to be stamped on the certificates representing the 28,000 shares of its publicly held preferred stock: "The shares represented by the within certificate are entitled to preference in liquidation according to the terms of the decree entered by the District Court of the United States for the Southern District of New York on October 17, 1914, as modified by the decree of said court entered on the 4th day of June, 1923, in the case of the United States of America *v.* The New York, New Haven and Hartford Railroad Company and others." The records of the meetings of the stockholders and directors of the holding company contain no reference to this stamping.

The publicly owned shares are "now held as to 1,030 shares by the holding company, as to 2,820 shares by the New Haven, and as to the remaining 24,150 shares by per-

sons other than the holding company or the New Haven."[1]
The aggregate number of shares of the preferred stock of
the holding company now held by the New Haven is
247,759.

On October 23, 1935, the New Haven filed in the United
States District Court for the District of Connecticut a
petition for its reorganization under § 77 of the United States
bankruptcy act (U. S. C. [1940 ed.] Title 11, § 205), and
that court approved the petition as being properly filed.
On March 13, 1936, that court entered an order authorizing
the president of the holding company to file a claim on
behalf of the four per cent preferred stock of the holding
company, and such a claim was subsequently filed "in
behalf of the 24,150 shares of the holding company pre-
ferred stock outstanding in the hands of the public."[2]  The
reorganization trustees were authorized to, and apparently
did, pay those holding company dividends guaranteed by
the New Haven which were due and payable through July,
1937, on the 24,150 shares, but no cash dividends have
been paid for subsequent periods.

On March 6, 1944, the reorganization court approved a
plan of reorganization which had been approved and certi-
fied by the interstate commerce commission.  Under that
plan the public holders of the preferred stock of the holding
company were relegated to the status of unsecured creditors
and were to receive that portion of the common stock of
the reorganized New Haven which their claim as finally
allowed for breach of the guaranty should bear to the aggre-

---

[1] This appears to have been the distribution of ownership since at least
1935.

[2] On March 28, 1936, a protective committee was formed on behalf of such
of the holders of the 24,150 preferred shares as should authorize the com-
mittee to represent them.  Ultimately the committee represented 19,563 of
the 24,150 shares; and it took over the prosecution of the above claim.  The
protective committee also filed a petition in the reorganization court seeking
an order that the New Haven be required to surrender for cancellation all
its holding company preferred stock and that all the holding company pre-
ferred stock other than the 24,150 shares be cancelled, or in the alternative
that the trustees of the New Haven be ordered to join with the holders of the
24,150 shares in a petition to this court for enforcement of the statutory lien
as provided for in St. 1910, c. 639, § 4.  For reasons which need not be con-
sidered here the petition for such an order was ultimately denied as to all
relief sought.

gate of the unsecured claims. The plan specifically provided that the reorganized New Haven should not assume its former guaranty of the preferred stock of the holding company, nor should it make any payment on such guaranty except as provided above. It further provided: "Nothing herein contained shall in any way impair any right of the public holders of the 24,150 preferred shares of the Boston Railroad Holding Company to realize on the lien or security of the shares of the capital stock of the Boston and Maine Railroad held by said holding company whether such right be at common law or under the statutes of Massachusetts, particularly St. 1909, c. 519, and St. 1910, c. 639, or under the decrees of the United States District Court for the Southern District of New York under date of October 17, 1914, and June 4, 1923." Subsequently the judge allowed $32 per share on the claim of the publicly held stock, payable, however, in common stock of the reorganized New Haven.

On September 11, 1947, the reorganization court entered its "Consummation Order and Final Decree" which provided, with exceptions not here material, that all the business, affairs and entire property of the debtor (meaning the New Haven) were to vest in and become the absolute property of the reorganized New Haven "free and clear of all claims, rights, demands, interest, liens, encumbrances of creditors or other obligees of the debtor"; the New Haven was discharged and released forever from all its "obligations, debts and liabilities, whether or not presented or allowed in these proceedings, including, without limitation, all claims made, assumed or guaranteed by the debtor . . . or enforceable against . . . [its] property"; and "all . . . certificates and shares of stock and all other securities . . . without limitation as to their nature, whether made or assumed or guaranteed by the debtor . . . or enforceable against . . . [it] or . . . [its] property, shall become void and unenforceable against the reorganized company." This decree further contained the usual clause perpetually enjoining all persons, firms and corporations

from further prosecuting by any type of proceedings any claims against the New Haven or its property except the obligations imposed upon it in the course of the reorganization proceedings.

At some time between January 28, 1944, and March 21, 1944, the petitioner herein purchased 10,000 shares of the preferred stock of the holding company from holders other than the New Haven. Of these shares 9,672 had been represented by the protective committee mentioned in the footnote on page 72. When the petitioner acquired these shares, "the certificates bore the New Haven's indorsement [of guaranty] and when new certificates were delivered they bore a like indorsement duly executed by the New Haven." These certificates also bore the indorsement ordered stamped thereon by the 1923 decree of the United States District Court for the Southern District of New York.

No dividends have been paid on any of the publicly held preferred stock of the holding company since 1937, except in so far as some holders may have received common stock of the reorganized New Haven under the above described plan of reorganization. The petitioner has never requested the issuance of or accepted any such stock.

By virtue of St. 1946, c. 518, the holding company was dissolved and a receiver was appointed to take charge of its property and to distribute its assets.[1] The provisions of that statute which are immediately material here are as follows: "Nothing in this act shall affect the rights of the holders of the publicly held or other preferred stock of Boston Railroad Holding Company, or the lien or liens or priority or priorities, existing in favor of such stock or any thereof. Said receiver shall distribute the assets in accordance with the rights of the respective parties in interest as determined by the court" (§ 4). Section 4 also provided that no distribution or sale of the assets was to be made

---

[1] The constitutionality of St. 1946, c. 518, was upheld in *Delaware & Hudson Co.* v. *Boston Railroad Holding Co.* 323 Mass. 282; appeal dismissed sub nomine *Boston Railroad Holding Co.* v. *Delaware & Hudson Co.* 336 U. S. 932.

prior to May 1, 1948, "except pursuant to a plan of liquidation approved by a majority of each class of stock (including as a separate class the publicly held preferred stock if the court shall determine that such preferred has rights differing from the rights of the other preferred) of Boston Railroad Holding Company, and approved by the court as fair and equitable."

At the present time the property of the holding company consists entirely of shares of stock of the Boston and Maine and proceeds from the sale of such stock as has been sold by the receiver by leave of court. The fair market value of these shares, on the basis of market quotations on January 12, 1951 (including the proceeds from sales thereof), did not exceed $4,000,000. The New Haven has filed with the receiver a claim showing an indebtedness of the holding company to it in the aggregate amount (exclusive of all amounts due it as a holder of preferred stock) of $12,476,-315.86, as of December 31, 1949. The origin of a portion of this claim and its possible relation to certain of the Boston and Maine securities held by the holding company will be discussed later.

The present petition has been brought by The Delaware and Hudson Company on its own behalf and on behalf of such other public holders of the preferred stock of the holding company as may join therein. It alleges in substance that by reason of the foregoing facts certain controversies have arisen between the parties which ought to be decided by this court before any distribution of assets is made by the receiver. In its answer the New Haven sets up what is in effect a counterclaim. The respective claims of the parties will be stated in more detail later. For present purposes it is enough to say that each party advances a theory of claim by which it hopes to gain a priority in liquidation and distribution over the other. The receiver takes a neutral position. He urges, however, that the questions presented by the petitioner and the New Haven are of importance in the administration of the receivership and ought to be determined in these proceedings.

### THE PETITIONER'S CLAIM.

The petitioner contends that by reason of various combinations of the foregoing facts the 24,150 publicly held preferred shares of the holding company are entitled to a priority in distribution over the preferred shares held by the New Haven. The various arguments advanced in support of this contention, as well as other considerations, will be treated separately.

### 1. PRIORITY BY REASON OF THE NEW HAVEN'S GUARANTY.

One of the grounds pressed in support of priority in liquidation for the publicly held preferred stock is the New Haven's guaranty, the details of which have been set forth earlier in this opinion. The petitioner argues that this guaranty was tantamount to an agreement on the part of the New Haven to subordinate its interests in the assets of the holding company to the interests of the holders of the public preferred, all of whose stock had been guaranteed. The petitioner relies on such cases as *Matter of Title & Mortgage Guaranty Co. of Sullivan County*, 275 N. Y. 347, *Pink* v. *Thomas*, 282 N. Y. 10, *Ferris* v. *Prudence Realization Corp.* 292 N. Y. 210, *S. C.* 323 U. S. 650, and *Agricultural Trust & Savings Company's Mortgage Pool Case*, 329 Pa. 581. These cases hold that a guarantor of mortgage certificates, who also has an interest in the mortgage, cannot share in the proceeds of its collection until the certificate holders are paid, unless there is a clear reservation in the certificate of the right of the guarantor to share on a parity with other certificate holders. The rationale of these cases seems to be that, if the guarantor were to share in the proceeds of the security before the holders of the guaranteed obligations have been paid, he would be derogating from his guaranty. This principle finds support in many jurisdictions and appears to be the prevailing rule.[1] We accept it as the law

[1] *Robbins* v. *Slavin*, 292 Ill. App. 479, 489–490. *Louisville Title Co.'s Receiver* v. *Crab Orchard Banking Co.* 249 Ky. 736, 741–742. *Dixon* v. *Clay-*

of this Commonwealth. But this does not advance the petitioner's contention. As indicated above, the consummation decree entered in 1947 released the New Haven from its guaranty of the preferred stock of the holding company and was an effective bar to the enforcement of that guaranty.[1] Provision was made for the revesting in the reorganized New Haven of its "entire property . . . free and clear of all claims . . . liens, [and] encumbrances of creditors or other obligees" of the New Haven, which, of course, included its preferred shares in the holding company. The New Haven was "discharged and released forever from all of . . . [its] obligations, debts and liabilities." All persons, firms and corporations were enjoined from further prosecuting by any type of proceedings any claims against the New Haven except those specifically imposed on it during the course of the reorganization. Reading the plan of reorganization and the consummation decree together, we think that their combined effect was to reconstitute the reorganized New Haven the absolute owner of its shares of preferred stock in the holding company, that as such an owner it was to have all the rights accorded to those shares by St. 1910, c. 639, and that it was not thenceforth to be affected in any way by its earlier guaranty of the preferred shares sold to the public. Thus with the guaranty no longer enforceable the principle now invoked by the petitioner has no application.

---

*ville,* 44 Md. 573, 579–580. *Preston* v. *Morsman,* 75 Neb. 358, 371–372. *Appeals of Fourth National Bank,* 123 Pa. 473, 486. *Fidelity Trust Co.* v. *Orr,* 154 Tenn. 538. *Reconstruction Finance Corp.* v. *Smith,* 96 S. W. (2d) 824 (Tex. Civ. App.). See *Commissioner of Insurance* v. *Conveyancers Title Ins. & Mortgage Co.* 300 Mass. 457, 467. Compare *Prudence Realization Corp.* v. *Geist,* 316 U. S. 89; *Prudence Realization Corp.* v. *Ferris,* 323 U. S. 650.

[1] So far as here material the statutes governing the reorganization of railroads, U. S. C. (1946 ed.) Title 11, § 205 (f), provide: "Upon confirmation by the judge, the provisions of the plan and of the order of confirmation shall . . . be binding upon the debtor, . . . and all creditors secured or unsecured, whether or not adversely affected by the plan, and whether or not their claims shall have been filed, and, if filed, whether or not approved, including creditors who have not, as well as those who have, accepted it. . . . The property dealt with by the plan, when transferred and conveyed to the debtor or to the other corporation or corporations provided for by the plan, or when retained by the debtor pursuant to the plan, shall be free and clear of all claims of the debtor, its stockholders and creditors, and the debtor shall be discharged from its debts and liabilities, except such as may consistently with the provisions of the plan be reserved in the order confirming the plan . . . ."

We are not impressed by the argument of the petitioner to the effect that the consummation decree did not extinguish the guaranty but merely gave the New Haven a defence, if pleaded, to an action on it, with the result that the guaranty still continued and afforded the basis of priority for the publicly held shares. See *Zavelo* v. *Reeves*, 227 U. S. 625, 629. We think that it would be giving too narrow effect to that decree in view of its broad language to keep alive rights flowing from the guaranty on the technical ground that only the remedy to enforce it was barred. As was said by Holmes, J., in *The Western Maid*, 257 U. S. 419, at page 433, "Legal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp." Moreover, the New Haven, a party here, has not waived the discharge granted by the consummation decree; on the contrary it has pleaded it in defence of the petitioner's claim. It is entitled to the benefits of the discharge to the same extent as if it had pleaded it in an action on the guaranty. Were the petitioner's argument to prevail, it would defeat and render illusory an important objective of the consummation decree.

### 2.   THE DECREES IN THE ANTI-TRUST CASE.

The petitioner earnestly argues that the owners of the publicly held preferred stock are entitled to a priority in liquidation by reason of the decrees in the anti-trust case. The facts relating to these decrees have been set forth above.

The purpose of both of the anti-trust decrees, we think, was to recognize, under the equitable principle discussed above, the priority accruing to the owners of the publicly held preferred stock by reason of the New Haven's guaranty. It was not their purpose to create a priority not theretofore existing. Rather they undertook to confirm and perpetuate a subsisting right. That right, as we have seen, fell when the guaranty was discharged. It is to be remembered that the decrees under consideration were entered in an anti-trust proceeding brought on the equity side of the court. Of

course, the Federal court possessed plenary power to put an end to an unlawful monopoly and to do all things that were necessary and proper to accomplish that result. *Ethyl Gasoline Corp.* v. *United States*, 309 U.·S. 436, 461. But it is one thing to recognize a priority already in existence and quite another to create one. It is difficult to see how the creation of a priority with respect to the publicly held preferred stock would have any legitimate place in anti-trust decrees of the sort here involved. The creation of such priority would have no tendency to put an end to the monopoly — the object of the proceedings — but would operate merely by way of punishment. If such had been the purpose of the decrees, serious questions touching the power of the Federal court to enter such decrees would be presented. We do not interpret the decrees as attempting to accomplish that purpose.

We do not pause to consider what the rights of the parties would be under that part of the 1914 decree that empowered the trustees to "take proper steps to subordinate the statutory lien enjoyed by the preferred shares of the holding company held by them to the lien of the 28,000 preferred shares of the holding company held by others," for this power was never exercised.

The petitioner stresses the importance of the words *"in any liquidation"* in that portion of the 1923 decree which provides that "the right attaching to the 28,000 shares of preferred stock" of the holding company "to be preferred *in any liquidation* of said . . . [company] to the remaining shares . . . held by the . . . [New Haven] shall in no manner be diminished or impaired" (emphasis supplied). It would be giving undue weight to those words to construe them as conferring a priority after the foundation for the priority, namely, the guaranty, had been discharged in the reorganization proceedings. The decree did not mean that the priority was to exist "in any liquidation" under any and all circumstances. At the time that the 1923 decree was entered the New Haven was presumably solvent and a discharge of the guaranty in bankruptcy or similar proceedings

could hardly have been contemplated. The decree must be read in the light of the conditions existing at the time it was entered.

### 3.  ESTOPPEL.

The petitioner further argues that the New Haven is estopped from asserting that the publicly held stock is not entitled in these proceedings to preference over its preferred stock.[1] "In order to work an estoppel it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done and which has resulted to his harm and that the other knew or had reasonable cause to know that such consequence might follow. But the doctrine of estoppel is not applied except when to refuse it would be inequitable. 'The law does not regard estoppels with favor, nor extend them beyond the requirements of the transactions in which they originate.'" *Boston & Albany Railroad* v. *Reardon*, 226 Mass. 286, 291. *Lunt* v. *Aetna Life Ins. Co.* 261 Mass. 469, 473. *McLearn* v. *Hill*, 276 Mass. 519, 524, 527. *Looney* v. *Trimount Theatres, Inc.* 282 Mass. 275, 278. And see *Cleaveland* v. *Malden Savings Bank*, 291 Mass. 295, 297–298; *Industrial Bankers of Massachusetts, Inc.* v. *Reid, Murdoch & Co.* 297 Mass. 119, 124.

The strongest point in favor of the petitioner on this aspect of the case would appear to be the effect, if any, of the holding company's indorsement on its certificates that its shares are entitled to a preference in accordance with the anti-trust decrees. The indorsement does not contain any misrepre-

---

[1] The argument in support of this contention is as follows: "The New Haven participated actively in a course of conduct which had the effect of leading the petitioner and other holders of publicly held preferred stock into believing that that stock would be preferred in liquidation over stock owned by the New Haven. The New Haven's assent in the anti-trust case to the 1914 decree, its 1923 petition in that case, the decree therein from which it took no appeal, its acquiescence in the indorsement on the stock certificates by the holding company, which it absolutely controlled, stating the preferential rights of the publicly held preferred stock, and its indorsement of its guaranty on the same certificate, together amounted to a representation, knowingly made, that the rights of its preferred stock would be subordinated in liquidation to the rights of the publicly held stock. That the petitioner, who bought its stock in 1944, and other owners of publicly held stock bought their stock in reliance on these representations cannot be successfully denied."

sentation of fact, either fraudulent or negligent. We have already indicated the reasons which led to the inclusion of the priority in the decrees and in the indorsement made pursuant thereto. In short, there was nothing unconscionable or misleading in the stamping of the indorsement on the certificates of the publicly held stock. The representations contained in the indorsement were true at the time they were made. Down to the time of the consummation decree a priority in favor of the publicly held stock *did* exist. But, as we have stated above, the situation was different after the consummation decree. There is no more reason to accord rights to the petitioner under the estoppel doctrine than there would be under the guaranty itself. And finally, it does not appear that the petitioner relied either on this indorsement or on the decrees when it purchased the stock. All that the record shows is that the petitioner acquired its shares through a broker who had in turn acquired them from the protective committee. We are of opinion that the basis for an estoppel is lacking on this record.

4. PRIORITY BY REASON OF THE NEW HAVEN'S SALE OF A PORTION OF ITS PREFERRED STOCK.

The petitioner argues that, irrespective of the New Haven's guaranty of the publicly held shares, the sale by it of that stock afforded the purchasers the right to a preference in liquidation over the preferred stock retained by the New Haven. The argument in support of this contention is as follows: "When the New Haven acquired its preferred stock it became entitled to a lien on any Boston and Maine stock at any time held by the holding company. Thus it was secured for the payment in liquidation of all accrued dividends and the payment of the par value of the preferred stock. Its rights were analogous to that of any other person holding security by way of mortgage or otherwise for the performance of some duty or obligation. When the New Haven sold the publicly held stock, the purchaser's stock

became entitled to a lien upon any Boston and Maine stock at any time held by the holding company."

The petitioner relies heavily on the cases of *Bryant* v. *Damon*, 6 Gray, 564, and *Foley* v. *Rose*, 123 Mass. 557, but neither case is in point here. Those cases relate to the situation presented when a mortgagee makes successive assignments to different persons of two notes secured by the same mortgage. In each case the mortgagee had expressly assigned the security to the first assignee of one of the notes, such assignee having on his own part bargained for that security. In determining the rights of a subsequent assignee of the other note secured by the same mortgage the question for decision was what equitable interest in the security had been retained by the original mortgagee after the first assignment. In both cases it was held that the subsequent assignee, whose rights stood no better than those of the assignor, was precluded from sharing on equal terms with the prior assignee in the security. Each case turned on the construction of the language of the first assignment in an effort to ascertain the intent of the parties thereto. The present case is clearly distinguishable on several grounds. But one which we think is decisive here is that, for all that appears, the New Haven did not purport to assign to any of the public holders of preferred stock any of its rights under the statutory lien on the Boston and Maine stock. If the principle for which the petitioner contends were adopted, we see no reason why it would not apply in any case where the owner of a majority of the shares of a preferred stock sold some of his shares to others without an express reservation of his rights to share pro rata on the liquidation of the corporation. Neither reason nor authority supports such a result.

### The New Haven's Claim of an Equitable Lien.

The New Haven in its answer asserts that the proceeds from the sale of 43,980 shares of prior preference stock of the Boston and Maine owned by the holding company is

subject to an equitable lien to secure a debt to the New Haven. The facts on which this claim rests are these. Pursuant to a plan of reorganization of the Boston and Maine in 1925, the holding company, as a stockholder thereof, became entitled to subscribe to 43,980 shares of a new issue of prior preference stock of the Boston and Maine. The purchase price was payable in instalments, and negotiable receipts were issued by the Boston and Maine against the payment of each instalment. When the last instalment was paid, the certificates for the stock were issued against that payment and the surrender of the negotiable receipts for the earlier instalments. The holding company did not have funds available for subscribing to this issue, but the New Haven nevertheless "caused the holding company to subscribe for said 43,980 shares."

There were six instalments. As each fell due, the New Haven advanced to the holding company the amount to be paid. In return it took a promissory note, payable on demand, with interest at seven per cent (the dividend rate on the prior preference stock) for the amount advanced, and each note except the last was secured by a pledge to the New Haven of the negotiable receipt issued to the holding company by the Boston and Maine on account of the particular instalment. When the last instalment was paid the Boston and Maine issued to the holding company definitive certificates for 43,980 shares of its prior preference stock, receiving from the holding company the negotiable receipts previously issued which had been surrendered to that company by the New Haven. On October 1, 1929, one month after the final instalment was paid, the six notes so taken by the New Haven from the holding company were surrendered in exchange for one note for the aggregate amount of $4,398,000, with interest at seven per cent. It does not appear that the definitive certificates were ever delivered to the New Haven by way of pledge or otherwise. The face of the final note and unpaid interest thereon are included in the New Haven's claim of $12,476,315.86 filed with the receiver.

The argument of the New Haven in support of its claim for an equitable lien is in substance this. The negotiable receipts which had been pledged to the New Haven were surrendered by it to the holding company so that the latter could surrender them to the Boston and Maine, as it was required to do, in order to receive the definitive certificates of stock. When the holding company received these certificates from the Boston and Maine, so runs the argument, the normal thing for the New Haven to do was to take this stock in pledge in substitution for the pledge of the negotiable certificates which it was releasing. But, as the New Haven concedes, this was attended with danger in view of St. 1906, c. 463, Part II, § 57 (see now G. L. [Ter. Ed.] c. 160, § 64), which provided that a railroad corporation without special permission could not "directly or indirectly subscribe for, take or hold the stock . . . of any other corporation." Indeed this provision, as construed by this court in *Attorney General* v. *New York, New Haven & Hartford Railroad,* 198 Mass. 413, brought about the formation of the holding company. Thus the New Haven because of the legal uncertainty as to its right to hold the Boston and Maine stock as pledgee decided not to run that risk. But the statute mentioned above, it is argued, did not forbid raising an equitable lien in favor of the New Haven on the proceeds of the prior preference stock. To do so, it is said, would be in accordance with the intent of the parties.

For reasons that will presently appear we need not decide whether in the circumstances an equitable lien would arise under general equitable principles. Nor do we reach the question whether the acquiring of such a lien by the New Haven would violate the provisions of G. L. (Ter. Ed.) c. 160, § 64. Here the New Haven's position is admittedly that of a creditor, and any equitable lien on the Boston and Maine prior preference stock would only be a means to the end of collecting the debt. The assets of the holding company consist entirely of shares of stock of various classes of the Boston and Maine or their proceeds. The indebtedness in question was contracted subsequent to 1910. To

recognize the lien asserted by the New Haven would be contrary to the express wording of St. 1910, c. 639, § 2, which provides that the preferred stock of the holding company shall be and constitute a charge and lien upon, and be secured by, "*all* stock of the Boston and Maine Railroad at *any time* held" by the holding company "Subject *only* to the rights of creditors of said Boston Railroad Holding Company existing at the date of the stockholders' meeting at which any of said preferred stock is first authorized" (emphasis supplied). Indeed, it appears that the only reason why this single class of creditors was given any right to reach the Boston and Maine stock ahead of the preferred shareholders was the fact that in 1910, when the preferred stock was authorized, the holding company was indebted to the New Haven in the sum of $20,012,000. It was this indebtedness which the New Haven in effect cancelled in return for the holding company's original issue of the preferred stock, and it was to protect this indebtedness that the single exception was made in favor of any creditors. Support for this conclusion is found in § 4 of the same act which provided the order of distribution of proceeds on any foreclosure of the statutory lien of the preferred shares. It was only after payment in full of accrued dividends and par to the preferred stockholders that the balance of the proceeds of sale, if any, was to be turned over to the holding company as a fund in which creditors or holders of common stock might share. We think it plain that the Legislature intended that creditors of the holding company who became such after the stockholders' meeting at which the preferred stock was authorized were to share in the proceeds of the Boston and Maine stock only after the statutory charge and lien of the preferred stock had been satisfied.

### The Decree.

It follows that a decree is to be entered declaring that the petitioner and other public owners of the preferred stock of the holding company are not entitled to any priority

in liquidation over the remaining shares of the same class, and that the New Haven is not entitled to an equitable lien on the 43,980 shares of the prior preference stock (or its proceeds) of the Boston and Maine owned by the holding company.

*So ordered.*

COUNIHAN, J. I concur in the opinion of the majority of the court with the exception of that part of the opinion which deals with the effect of the decree of the Federal court in New York dated June 4, 1923, in the anti-trust suit. Without reciting in detail my reasons therefor, I am of opinion that the effect of that decree was to subordinate the rights of the preferred stock of the holding company held by the New Haven to the rights of the publicly held preferred stock in any liquidation of the holding company.