The DELAWARE AND HUDSON COMPANY, Petitioner,

v.

The NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, and Connecticut Railway and Lighting Co., Respondents.

No. 16562.

United States District Court, D. of Connecticut.

Nov. 29, 1954.

Frederick H. Wiggin, New Haven, Conn., for The Delaware and Hudson Co. Henry V. Atherton, Herrick, Smith, Donald, Farley & Ketchum, Boston, Mass., Donald D. Dart, New York City, of counsel.

J. H. Gardner, Jr., New Haven, Conn., for The New York, New Haven and Hartford R. R. Co.

Beekman & Bogue, New York, N. Y., for Connecticut Ry. and Lighting Co. Edward K. Hanlon, A. T. Wenzell, New York City, of counsel.

HINCKS, Circuit Judge.

This petition, filed in these proceedings on May 8, 1953, almost six years after entry of the Final Decree and Order of Consummation, frankly seeks a reopening of Order 763, which had been entered on Claim 82 on August 4, 1944, some three years prior to the Final Decree and Order of Consummation.

### Background of the Petition

Claim 82 was one timely filed in behalf of the publicly-held preferred stock of the Boston Railroad Holding Company (hereinafter referred to as the Holding Company). That was a corporation specially chartered by the Commonwealth of Massachusetts in 1909 "for the sole purpose of acquiring and holding the whole or any part of the capital stock, bonds and other evidences of indebtedness of the Boston and Maine Railroad, and of voting upon all certificates of stock so acquired and held, and of receiving and collecting dividends and interest upon said stock, bonds and other evidences of indebtedness." Acts and Resolves of Massachusetts 1909, Chapter 519. As originally chartered only common stock was authorized and from its inception all of its common stock had been held by The New York, New Haven and Hartford Railroad Company (hereinafter called the New Haven) and by virtue of that ownership the trustees of the estate of the principal debtor in reorganization (the New Haven) had succeeded to the control of the corporation upon the filing in this Court of the petition for reorganization.

In 1910, the charter of the Holding Company was amended by an Act, Acts and Resolves of Massachusetts 1910, Chapter 639, permitting the Holding Company to issue preferred stock having a par value of $100 per share. That Act states in Section 1 that:

"The holders of such preferred stock shall, in preference and priority over all other stock of the corporation, be entitled, upon dissolution of the corporation or in liquidation of its affairs, or in case of a default in the payment of any stipulated dividend on said preferred stock, to payment of the par value thereof and accrued dividends thereon, and shall further be entitled to semi-annual dividends, which dividends shall be cumative."

It is also provided, Section 2, that:

"* * * said preferred stock, to the amount thereof at par at any time outstanding, and of all accrued and unpaid dividends thereon, shall be and constitute a charge and lien upon, and be secured by, all stock of the Boston and Maine Railroad at any time held by said Boston Railroad Holding Company."

In Section 4 of the amendatory Act are to be found the provisions allowing the holders of a majority of the preferred stock, in case of default in payment of dividends, to apply to the Supreme Court in Massachusetts for an order for the sale of Boston and Maine stock in order to enforce the lien of the preferred stock thereon. In case of any such sale it is there provided that the proceeds

"shall be applied, after payment of expenses of the sale—first, to the discharge of any claims which existed prior to the date of the meeting at which any of such preferred stock was first authorized; second,

to the payment of all accrued and unpaid dividends to which, by the terms of this act, such preferred stock was entitled to the date of said sale; third, to the payment in full, or if said proceeds are insufficient therefor then to the equal pro rata partial payment, of the par value of said preferred stock, and the balance, if any, of the proceeds shall be paid to said Boston Railroad Holding Company."

Section 5 of the amendatory Act states that:

"Any railroad corporation owning any of the common stock of said Boston Railroad Holding Company may acquire, hold, own and sell any of the preferred stock authorized by this act, and may guarantee the payment of the stipulated dividends thereon, and of the par value thereof in case of liquidation or distribution of said Boston Railroad Holding Company, and of any deficiency resulting from a sale under the provisions of the preceding section of this act."

Agreeable to this provision, the New Haven as the owner of all of the common stock of the Holding Company acquired a substantial block of said preferred stock, a small part of which it sold to the public. At petition filed there were validly issued and outstanding 272,939 preferred shares of the Holding Company, of which the New Haven Trustees on their appointment succeeded to 247,759 shares; 1,030 shares were held in the treasury of the Holding Company and 24,150 shares were held by the general public (hereinafter referred to as the publicly-held preferred stock).

The certificates representing the 24,150 publicly-held preferred shares bear the following guarantee of the New Haven as authorized by Section 4 of the Massachusetts Acts and Resolves of 1910:

"For value received, The New York, New Haven and Hartford Railroad Company, a corporation es-tablished and acting under the laws respectively of Connecticut, Massachusetts and Rhode Island, hereby guarantees the payment of cumulative dividends on the shares of stock represented by this certificate at the rate of four per centum (4%) per annum as stipulated in this certificate, and the payment of one hundred dollars ($100.) upon each share of said stock in case of liquidation or distribution of Boston Railroad Holding Company, and of any deficiency resulting from a sale under the provisions of Section 4 of Chapter 639 of the Acts of Massachusetts of the year 1910."

Pursuant to Orders Nos. 117 and 183 herein the New Haven Trustees paid the guaranteed semi-annual dividends, each aggregating $48,300, which became due January 10 and July 10 in 1936 and 1937 upon the publicly-held preferred shares but defaulted in all subsequent payments of dividends.

At no stage in the proceedings did the New Haven Trustees recommend assumption of the New Haven guarantee nor, concededly, was its assumption provided for in the effective Plan of Reorganization. On the contrary, as early as March 22, 1940, Division 4 of the Interstate Commerce Commission issued a proposed report and order providing for disaffirmance of the guarantee and that provision was consequently included in every plan prepared by the Commission including that finally approved and carried into effect by the Final Decree and Consummation Order.

Meanwhile, however, on March 30, 1936, the President of the Holding Company, by authority of the Court, filed in behalf of those holding the guaranteed preferred stock an unsecured claim alleging that the dividend due on January 10, 1936, had not been paid and that further dividends would thereafter become due. The management of this claim was thereafter assumed by a Protective Committee for the preferred stockholders which by sanction of the Interstate Commerce Commission given on August

13, 1936, became the representative of 19,577 shares of publicly-held preferred stock. This Committee also filed Petition for Order 570 seeking to compel action by the New Haven Trustees looking to a liquidation of the Holding Company which, as shown above, was the contingency upon which the guarantee of par value depended. On April 10, 1941, the New Haven Trustees filed their answer to this petition and also an answer to Claim 82 wherein they asserted that all claims in behalf of the preferred stock were so uncertain and contingent as not to be allowable. For reasons which then seemed sufficient but now are not important, decision on Claim 82 and Petition for Order 570 was deferred pending further development of the reorganization proceedings until 1944. By that time it had become fully apparent that the final Plan of Reorganization would provide for disaffirmance of the Holding Company guarantee. With this firm prospect in view, Claim 82 and Petition for Order 570, both of which had previously been submitted in a combined record of fact, came on for decision. On March 6, 1944, the very date of my order approving the Plan of Reorganization, I entered a Memorandum of Decision denying Petition for Order 570. In this memorandum, I indicated a conclusion that a present liquidation of the Holding Company in which the New Haven estate had a large investment was "plainly not to the advantage of the New Haven estate" and denied the petition which sought to compel the New Haven Trustees, who were the owners of a majority of the Holding Company preferred stock, to apply under the Massachusetts Act to the Supreme Judicial Court of Massachusetts for a liquidation of the Holding Company assets.

On July 28, 1944, my Memorandum of Decision was filed on Claim 82, which the Petitioner now seeks to reopen. In this memorandum I treated the claim as one for an allowance (1) on account of a breach of the guarantee of payment of $100 (par value) on the preferred stock by reason of the disaffirmance of the guarantee under the Plan, and (2) on account of a breach of the guarantee of the stipulated dividends on the preferred stock. For the breach of the dividend-payment guarantee I held that $32 per share should be allowed. It may be noted in passing that the pending petition does not question that element of the allowance. In disposing of the claim for allowance on account of the breach of the guarantee of par value, I pointed out that the guarantee was contingent upon a liquidation or sale of the Holding Company assets and that by Order No. 570 I had ruled that only the New Haven Trustees, as the owner of the majority of the preferred stock, had power under the Massachusetts Acts incorporating the Holding Company, to institute liquidation proceedings. It may be noted now, although I seem not to have mentioned the fact in that memorandum, that the Supreme Judicial Court of Massachusetts, in an opinion entered March 1, 1944, Hurley v. Boston Railroad Holding Company, 315 Mass. 591, 54 N.E.2d 183, had held that a holder of the publicly-held preferred stock who held less than a majority of the outstanding preferred stock had no standing to initiate liquidation proceedings. Accordingly, in view of the persistent opposition of the New Haven Trustees, who held the majority of said stock, to a liquidation and the complete absence of proof "that a liquidation or sale will occur in the future," I concluded as follows: "Since the guarantee of principal is to become effective only upon a contingency which, in so far as the proofs show, may and probably will never come to pass, I must hold that no loss has been proved on account of the breach of this branch of the guarantee." And on Claim 82, Order 763 entered on August 4, 1944, whereby it was:

"Ordered, Adjudged and Decreed:

"(1) That a common claim against the estate of the Principal Debtor herein for breach of its guarantee of cumulative dividends at the rate of four per centum (4%) per annum upon the 24,150 shares of the

preferred stock of Boston Railroad Holding Company held by members of the public and upon the 1,030 like shares held by Boston Railroad Holding Company be and it hereby is allowed at thirty-two dollars ($32.-00) per share upon each of said shares.

"(2) That any and all other claims against the estate of the Principal Debtor herein on behalf of the preferred stock of Boston Railroad Holding Company be and they hereby are wholly disallowed, denied and dismissed."

From this Order, as also from Order 570, no appeal was ever taken.

The Petitioner, which is the sole owner of the Delaware and Hudson Railroad Corporation, now owns 10,000 shares of the publicly-held preferred stock of the Holding Company, most of which had previously been represented by the Protective Committee of the preferred shareholders. Its first purchase was made on January 27, 1944, while Petition for Order 570 and Claim 82 were still pending, undecided, in this Court. Its last purchase was made on March 8, 1944, two days before the entry of the Memorandum of Decision directing the denial Petition for Order 570. The stock never was transferred on the Holding Company's transfer books: title thereto remained at all times thereafter in the name of the Petitioner's brokers. The Petitioner never filed any appearance, and never participated as of its own right and in its name, in the reorganization proceedings until the filing of its pending petition. It never disassociated itself, at least as of record, from the management of Petition for Order 570 or the prosecution of Claim 82 by the Protective Committee for the publicly-held preferred stock which had purported to represent at least a substantial part of said stock which the Petitioner acquired in 1944.

The pending petition alleges in effect that by Chapter 518 of the Act of 1946, approved June 11, 1946, (which I will hereinafter refer to as the "Dissolution Act") the General Court of Massachusetts dissolved the Holding Company. The dissolution was pursuant to Section 2 of Chapter 437 of the Massachusetts Acts of 1903 which provided:

"The charters of all corporations which are subject to the provisions of this act and which have been incorporated by special law since the eleventh day of March in the year eighteen hundred and thirty-one and all of such corporations as may be hereafter incorporated by special law shall be subject to amendment, alteration or repeal by the general court."

The petition further alleges that, pursuant to Section 3 of the Dissolution Act, on July 3, 1947 the Petitioner and other preferred stockholders filed a petition in the Supreme Judicial Court of Massachusetts for a receiver, and that after extended litigation (which culminated in Delaware and Hudson Company v. Boston Railroad Holding Company, 323 Mass. 282, 81 N.E.2d 553, appeal dismissed 336 U.S. 932, 69 S.Ct. 746, 93 L.Ed. 1092, a receiver was appointed on June 15, 1949. Thus by legislative fiat a liquidation of the Holding Company assets was accomplished which under the charter of the Company could be brought about only by a majority of the preferred stock. The Petitioner further alleges that in the liquidation proceedings which ensued in the Massachusetts Court there became available to the Petitioner out of the proceeds from the liquidation of the Holding Company assets, only $11.-32 per share. All these allegations were undisputed and are adopted as part of my findings herein.

In the light of these facts, all of which occurred subsequent to my Order on Claim 82, the Petitioner now prays that I reopen Order 763 which was entered on Claim 82 and allow an unsecured claim on its stock in the amount of $88.68 per share, that being the difference between the par value thereof and its distributive share of the proceeds of the liquidation proceedings. The con-

tention is that Order 763 was erroneous in that in ruling that the par value guarantee was to become effective only upon a contingency which "may and probably will never come to pass," I erred in failing to take into account the possibility of liquidation by legislative fiat under the Act of 1903. And so the Petitioner urges that, now that the contingency has actually come to pass by liquidation proceedings which were initiated prior to the Final Decree and Consummation Order and completed thereafter, I should now revise Order 763, at least in so far as it affects the Petitioner, to give effect to the hindsight which now is available.

### Jurisdiction

■ At the outset is presented a question as to the jurisdiction of the reorganization court to grant the relief sought at this late stage in the proceedings on a petition brought long after the Final Decree and Consummation Order. Petitioner claims first that the Final Decree and Consummation Order must be interpreted to carry into effect portions of Sections J and K of the Plan as follows:

"Sec. J, Clause (17) The common stock available for distribution to the holders of unsecured obligations and claims shall be distributed among them upon the basis of the relationship between the amount of each claim as finally allowed by the Court to the total amount of all such claims. The public holders of 24,-150 preferred shares of the Boston Railroad Holding Company shall, *to the extent finally allowed by the court for any breach of the contract of guaranty, both for par value and dividends*, be included among the holders of unsecured obligations and claims.

"Sec. K * * * The principal debtor's guaranties of the bonds of the New York, Westchester and Boston Railway Company * * * and of the preferred stock of the Boston Railroad Holding Company, shall

not be assumed by the reorganized company. No payment shall be made by the reorganized company upon, or on account of, such guaranty of the preferred stock of the Boston Railroad Holding Company, except as provided in clause (17) of Section J hereof."

But as to these provisions it must be remembered that the effective "Plan" was the Fifth Supplemental Order of the Interstate Commerce Commission which emerged from that authority on February 8, 1944, and which was approved by the reorganization court on March 6, 1944. Thus any provisions of the Plan which seemed to place the claim of owners of the publicly-held preferred stock of the Holding Company in the category of the unliquidated claims were speaking prospectively as of February, 1944. Claim 82 was definitely and finally removed from that category by Order 763 (August 4, 1944) whereby that claim, except for the allowance of $32 per share on account of the dividend guarantee was unequivocally "wholly disallowed, denied and dismissed." In the face of the language in that Order and in the light of the memorandum which preceded it, it is wholly untenable to urge now that the claim on account of a possible breach of the par value guarantee was never adjudicated.

■ Equally inadequate to support the jurisdiction now invoked is Section XI, 2, (f) and (g), of the Final Decree and Consummation Order of September 11, 1947, which read as follows:

"(f) To consider and act in the matter of the proof of any claim against the Debtor which shall have been filed or for which provision shall have been made in the Plan as of the date of this order but the amount of which shall not have then been fixed.

"(g) To consider and act in the matter of the reservation of the shares of Common Stock of the Reorganized Company in so far as necessary to provide for any claim, in-

cluding the claim of the Secured Sixes for the difference above mentioned, the amount of which has not been fixed as of the date of this order."

By the entry of Order 763, Claim 82 was plainly removed from the category of claims provided for by these subparagraphs (f) and (g). This is sufficiently attested by the concise language of these subparagraphs which limited their coverage to claims "the amount of which shall not have then (September 11, 1947) been fixed." So clear is this conclusion that I find it unnecessary to expand at this point this memorandum by a long recital of the history of the reorganization proceedings which would show that subparagraphs (f) and (g) were included in the Final Decree and Consummation Order only to permit the Court by an appropriate reservation of jurisdiction to provide equal treatment in accordance with the Plan for three large claims not then liquidated. These were the claims of the so-called Secured Sixes, the claim of the Boston Terminal Company trustee and the claim of the Boston and Providence Railroad Company, all of which will be described in a subsequent section of this memorandum.

I, therefore, overrule the contention that under the Plan and Final Decree and Consummation Order jurisdiction was expressly reserved to the Court to grant the relief now sought.

■ Notwithstanding, the Petitioner claims that the jurisdiction necessary to support its petition may be found either in Section 57, sub. k of the Bankruptcy Act, 11 U.S.C.A. § 93, sub. k, or Section 2, sub. a(8) thereof, 11 U.S.C.A. § 11, sub. a(8); under Rule 60(b) of the Federal Rules of Civil Procedure, 28 U.S. C.A. and also in the general power of the Bankruptcy Court sitting as a court of equity. Whether these statutory provisions and Federal Rules of Civil Procedure 60(b) have application, *ex proprio vigore,* to railroad reorganization cases under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, I have grave doubt. But there is no need here to make a de-

finitive ruling on that point because even if applicable they go no further than to recognize the power of a Court of Bankruptcy, to exercise the powers generally inherent in a court of equity including the power to reopen and revise its own decrees. That this power extends to railroad reorganization cases, notwithstanding the flavor of finality in the text of Section 77, sub. f, is, I think, attested by the language of subdivision a thereof whereby it is provided that the reorganization court "may exercise in addition to the powers conferred by this section all the powers, not inconsistent with this section, which a Federal court would have had if it had appointed a receiver in equity of the property of the debtor for any purpose." And that a court of equity has such power is indicated by Wayne United Gas Co. v. Owens-Illinois Gas Co., 300 U.S. 131, 57 S.Ct. 382, 81 L.Ed. 557; Pfister v. Northern Illinois Finance Corp., 317 U.S. 144, 63 S.Ct. 133, 87 L.Ed. 146; Bowman v. Loperena, 311 U.S. 262, 61 S.Ct. 201, 85 L.Ed. 177; and In re Barnett, 2 Cir., 124 F.2d 1005. The requisite of "cause shown" for a reopening under Section 2, sub. a(8) of the Act has no meaningful distinction from the definition of a "cause" which would justify a reopening of its decree by a court of equity.

Equitable Standing of the Petitioner

■■ And so on the assumption that in a proper case the reorganization court under Section 77 may reopen and revise its decree, I proceed to consider whether this is such a case. At the outset it must be remembered that the power even in an equity court is by no means absolute. By analogy with the law relating to a motion for a new trial the power will not be exercised merely to give effect to matters either of law or of fact which the movant might by reasonable and seasonable diligence have presented at the original trial. Were it otherwise, a decree in equity would be unduly shorn of finality and parties would be free to conduct litigation on a piecemeal basis withholding one defense until others had been adversely disposed of, and practice

in equity would still be as interminable as in the days of Charles Dickens. However, it will not do literally to analogize a petition for reopening addressed to the Bankruptcy Court to a motion for new trial. Rule 59 of the Federal Rules of Civil Procedure providing that motions for new trials must be brought within ten days is not applicable to the Bankruptcy Court, 6 Moore's Federal Practice, Par. 59.04(12); nor is the Bankruptcy Court which sits without stated terms circumscribed by the rule that even a court of equity may not, at least if fraud is absent, revise its decrees in subsequent terms of court. Nevertheless, to justify a reopening a petitioner must have some ground not reasonably available to him in the prior litigation. Otherwise he lacks equitable standing to invoke the process of equity.

■ In this case the facts bearing on the equitable standing of the Petitioner are as follows. The stock, which is the only basis of its claim, had theretofore been represented of record in these proceedings by the Protective Committee, and it was acquired by the Petitioner in time to permit it to participate in the prosecution of Claim 82 before the claim went to judgment. Neither the Petitioner nor the parties of record to that litigation called the attention of the Court to the existence of the Massachusetts Act of 1903 by virtue of which the Massachusetts Legislature had power to revoke the Holding Company Charter and thus force a liquidation of its assets. Even more important was the complete failure to bring to the attention of the Court facts indicating that liquidation as a result of legislative fiat was more than a theoretical legal possibility. In view of the complete absence of such a showing I doubt that the "error" inherent in Order 763 on which the Petitioner now relies for a revision of that Order, was error at all. And if there was no error it would seem that the petition should fail.

However, for present purposes at least, I will assume that although the parties left me free to make my own mistakes, I should have taken judicial notice of the Massachusetts Act reserving to the legislature the power to repeal corporate charters, and that my failure so to do constituted error. But even so, has the Petitioner standing now to seek a revision of that error? For the answer to this question I look to the record of fact made on this petition.

From the record of fact I find that the Petitioner's purchase of the stock on which it now claims was ratified by the Petitioner's Executive Committee on March 10, 1944, upon a report by its President that there was a default in the dividends due on the Holding Company preferred stock and that "It is contended that this default affords a matured right to liquidate the Holding Company, thus making its assets available for the claims of the public-held preferred stock. If successful, such a liquidation should result in the distribution or disposal of Boston and Maine stock and its removal from the control of the New Haven." The report went on to explain that Petitioner's subsidiary had "an average annual exchange of traffic with the Boston and Maine Railroad Company of about 28% of its gross freight business and it is therefore important to it that this exchange be maintained on an open competitive basis without undue influence for the New Haven or any other source." The Petitioner's ratification of the purchase was accompanied by a resolution enabling its officers to take steps considered "necessary to protect and enforce" its interests and rights in its investment in the Holding Company preferred stock. And on the same day its Boston counsel, who had already been retained "to represent this company in any proceedings initiated pursuant to the resolutions," was advised by Petitioner's General Counsel of what had been done. And yet when Order 570 and 570A was entered on March 17, 1944, which finally disposed of the effort to compel a liquidation of the Holding Company via the Reorganization Court, and when Order 763 was entered which adjudicated Claim 82, the Petitioner, still without disclosure of

its interest as a preferred stockholder, chose not to invoke the available equity remedy in the reorganization court but continuously thereafter remained outside the reorganization proceedings. It is plausible to believe that even at this early stage the Petitioner planned to foment legislation designed to accomplish liquidation. If so its failure to communicate to this Court the increasing imminence of liquidation by legislative fiat impaired its equitable standing to present that factor to the court after entry of Order 763.

But that is not all. In the Petitioner's printed Annual Report, issued as of December 31, 1944, it was recited that by "a public statement *of May 15, 1944*," it had disclosed its acquisition of a substantial block of the publicly-held preferred stock "which is entitled to priority in liquidation of the assets of the Holding Company, which assets consist of stock of Boston and Maine Railroad carrying about 27% of the voting power of that railroad." This public statement of May 15, 1944, was further quoted as stating that "in association with certain other holders of the preferred stock, it *will shortly take steps to secure the distribution of Boston and* Maine stock held by the Holding Company." Yet never did the Petitioner seasonably "take steps" to accomplish liquidation of the Holding Company by invoking the equitable process of the court either by participation in the litigation on Claim 82 or, after the entry of final order on that claim, by seasonable motion for its revision. Instead, as is shown in the Petitioner's Annual Report for 1944, it appears that as early as January 5, 1945 steps had been taken to obtain liquidation of the Holding Company through its dissolution by legislative fiat and legislation to that end was submitted to the Massachusetts Legislature which the Petitioner actively supported in hearings before a legislative committee. This objective was accomplished on June 11, 1946, by the passage of an Act, Chapter 518 of the Acts of 1946, which announced that the "corporate existence (of the

Boston Railroad Holding Company) is hereby terminated and annulled" and provided, on certain conditions, for its receivership and liquidation. On July 2, 1947, the earliest date permissible under the Dissolution Act, the Petitioner joined with other preferred shareholders in a petition to a Massachusetts Court for the receivership and liquidation of the Holding Company which filed an answer in opposition attacking the constitutionality of the Dissolution Act.

I think it worth noting that the liquidation pursuant to legislaitve fiat was at this stage when, on Sepember 11, 1947, upon a hearing duly noticed, the Final Decree and Order of Consummation in the reorganization proceedings was, without intervention or opposition by the Petitioner, entered by this Court. Although the Petitioner by the pending petition seeks a reopening of Order 763 on Claim 82 on a claim that in that Order I erroneously failed to reflect in the allowance of the claim the possibility of liquidation by legislative fiat, the foregoing history of its activities shows that that possibility was very much in its mind at least as early as January, 1945, and, perhaps, as early as May, 1944, when in its public statement of that date, quoted in its annual report for 1944 referred to above, it promised to "take steps" to bring about the liquidation of the Holding Company. Thus the subject-matter, upon which the present petition is predicated, is clearly shown to have been in the Petitioner's mind, and yet not presented to the reorganization court, for at least two years and eight months before entry of the Final Decree and Consummation Order in these proceedings. It may also be noted that throughout the development of the consummation process the Petitioner failed to make its position known to the court with respect to the subject-matter of successive hearings, too numerous here to relate, which if disclosed might have affected judicial action.

However, to cap the saga of the unhappy Holding Company with a brief account of its disembowelment, it will suf-

fice to say that its attack on the constitutionality of the Dissolution Act proved unsuccessful, Delaware and Hudson Co. v. Boston Railroad Holding Company, 323 Mass. 282, 81 N.E.2d 553, Appeal Dismissed 336 U.S. 932, 69 S.Ct. 746, 93 L.Ed. 1092, and the liquidation proceeded. However, when it came to a distribution of the proceeds in liquidation the Petitioner's contention that the lien of the publicly-held preferred stock upon the Holding Company assets was prior to that of the far larger block of preferred stock held by the New Haven estate was overruled and finally determined adversely to the Petitioner. Delaware and Hudson Company v. Boston Railroad Holding Company, 328 Mass. 63, 102 N.E.2d 67, certiorari denied, 343 U.S. 920, 72 S.Ct. 676, 96 L.Ed. 1333. As a result, the Massachusetts liquidation court allowed only $11.33 per share on the Holding Company preferred stock. Notice of this allowance was sent to preferred shareholders on March 6, 1953, and as above noted, the pending petition was filed in this court on May 8, 1953, whereby the Petitioner contends that notwithstanding the entry of Order 763 of August 4, 1944, allowing the claims of publicly-held preferred stock of the Holding Company in the amount of $32 per share, its claim on said stock should now, by drawing on hindsight not available in 1944, be allowed for the difference between $11.33 and $100 (par value), per share.

From the foregoing, I think it a fair inference that the Petitioner, prior to the entry of Order 763, had such knowledge of the imminence of liquidation by legislation that to preserve its right to invoke equitable relief it should have presented its information to the Court in the litigation on Claim 82. True, the Petitioner could not then be sure that its effort to transfer the controversy from an equity to a legislative forum would prove successful. Nevertheless it could have presented such information as it had—coupled, if desired, with a motion for a continuance of the litigation in this court until the success of its objective could have been more accurately appraised. If this had been done and had resulted in an adverse order, the Petitioner could have kept its contention alive by a seasonable appeal.

However that may be, the Petitioner's success in the legislative forum was achieved by the enactment of the Dissolution Act in June, 1946. Thereupon it became incumbent upon the Petitioner, to preserve its right to equitable relief in the premises, to make seasonable application for the revision of Order 763 before its provisions should become hardened into the finality of a Final Decree or, by other appropriate motion, bring its status as a suitor in equity to the attention of the Reorganization Court. Yet, as found above, no such action was taken.

I conclude, therefore, that on the record the Petitioner lacks the requisite equitable standing to invoke the relief now belatedly sought.

### Intervening Rights

Although I hold that the conclusion just expressed is ample ground, standing by itself, for a dismissal of the petition, the same result is even more imperatively required by application of the rule that a court of equity will not reopen its decree when such action will impair intervening rights.[1] To understand the nature of the rights here involved it is necessary for one to review certain features of the effective Plan and the proceedings in consummation thereof.

The so-called Fifth Supplemental Order of the Commission comprised the Plan which ultimately was approved, confirmed and embodied in the Final Decree and Consummation Order of the Court. This Plan, like those embodied in prior Orders of the Commission, provided that the entire issue of new common stock authorized under the Plan

---

1. See Grand Union Equipment Co. v. Lippner, 2 Cir., 167 F.2d 958; Mohonk Realty Corp. v. Wise Shoe Stores, 2 Cir., 111 F.2d 287; 6 Collier on Bankruptcy, Par. 11.21; Note, 61 Harvard L.R. 1042.

should be used for the discharge of duly filed unsecured claims as allowed by the Court. Its basic provision was that the participation of each such claimant should depend upon the proportion of the amount of his claim as allowed to the aggregate allowances of all the unsecured claims even though, as a result, claimants should thereby receive amounts of new common stock having a stated par value ($100 per share) in excess of the amount of their claims as allowed, thus recognizing that the new stock would have an actual, or fair market, value so much less than its par value that the claimants could not possibly obtain *in value* more than the allowed amounts of their claims.

This Plan, however, did contain one new feature in its provision whereby the liquidation of the claim in behalf of a bond issue, collaterally secured,—the bond issue known as the "Secured Sixes" —was to be postponed until after the contemplated Consummation Order. If, in the liquidation of its claim, this secured claimant, whose claim had been allowed in its face amount should receive less than payment in full, it was provided that it should be entitled to claim as an unsecured creditor for the balance of its claim. To provide equal treatment for any unsecured claim that might thus result the Plan, by Section J(10) (d), provided not only for post-consummation determination of the deficiency but also that the Court should determine at the time of consummation the amount of common stock necessary to reserve for the satisfaction of any possible deficiency, that it should reserve the amount so determined and that "any excess so reserved (was) to be sold by the Reorganization Committee and the proceeds distributed in lieu of stock or scrip to the holders of the new common stock." The Plan expressly provided, Section J (10) (e), that jurisdiction to accomplish this was to be expressly reserved to the Court. Similar provision was made for possible deficiencies which might be established subsequent to consummation in

behalf of several banks which were collaterally secured.

Two other claims require mention, viz., those of the Boston Terminal Company and its bondholders and of the Boston and Providence Railroad Corporation both of which were in process of reorganization, under Section 77 of the Bankruptcy Act, in the United States District Court of Massachusetts. For the Boston Terminal Company interests the Plan expressly provided (Section N.1(b)) a procedure whereby its Trustee in Bankruptcy might thereafter elect to "file a proof of claim in damages in these proceedings." And on appeal from the Order approving the Plan this right was construed to include a right in behalf of Terminal Company bondholders to claim as unsecured creditors for a possible mortgage foreclosure deficiency. Old Colony Bondholders v. New York, N. H. & H. Railroad Co., 161 F.2d 413, 426 and 427, certiorari denied 331 U.S. 859, 67 S.Ct. 1755, 91 L.Ed. 1866. And as to the Boston and Providence, the existence of a claim not yet fully adjudicated was recognized although the only specific treatment of the claim proposed in the Plan was for its cancellation as one out of several stated terms upon which a sale of the Boston and Providence Railroad to the New Haven should be accomplished if consistent with a plan of reorganization for that railroad thereafter approved by the Massachusetts Court. Since no such plan for the Boston and Providence had, at consummation date, been approved, under the basic provision in the New Haven Plan for the treatment of unsecured claimants it was necessary to provide for the Boston and Providence unsecured claim the same treatment as that provided for other unsecured creditors of the New Haven. The propriety of that arrangement and the validity of the reservation of jurisdiction to the reorganization court was sustained in In re New York, New Haven and Hartford Railroad Company, 169 F.2d 337.

In order that the consummation of the New Haven reorganization might be ac-

complished without awaiting the liquidation of these claims, the Plan contained a provision, Section J(17), whereby the Court was to determine and reserve, at the time of Consummation, the amount of common stock necessary "for the satisfaction of claims not then liquidated." As noted above, the Plan spoke as of February 1944, and contemplated that this provision for unliquidated claims might include Claim 82 as well as certain partially secured Bank claims which in 1944 were not liquidated. But before the Final Decree and Consummation Order, Claim 82, as noted above, had been liquidated by adjudication and the Bank claims by settlements.

After entry of the Final Decree and Consummation Order the court, after hearing duly noticed and having in mind the provisions of the Plan for the treatment of the claims of the Secured Sixes, the Boston Terminal Trustee and the Boston and Providence, which then were the only claims remaining unliquidated, ordered (No. 1016, April 5, 1948) that $60,466,872.99 in par value of the new common stock should be reserved for later distribution and that $46,916,727.-01 in par value of said issue should be distributed to unsecured creditors, whose claims had theretofore been liquidated in that aggregate amount, at the rate of $100 par value of common stock for each $100 of the claims as allowed.

The Plan, it will be recalled, had contemplated that so much of the stock reserved as should not be needed to provide equal treatment for the unliquidated claims upon their determination, should be sold and the proceeds distributed, *pro rata*, to the creditors who should have received the initial allotment of the stock. However, at this stage the Reorganization Committee by Petition for Order 1028 sought authority to supplement the initial distribution of the certificates of the new common stock with a distribution, in the same proportions, of negotiable "Certificates of Interest." This pe-

tition was granted by Order (No. 1028) entered May 19, 1948, whereby the text of the Certificates of Interest was specifically approved. A specimen in blank of the approved form of the Certificates of Interest, designated as Appendix A, may be appended hereto and constitute a part hereof.[2] It will be observed that the certificates, which pursuant to Order 1028 were issued to unsecured creditors together with the initial distribution of common stock, recite the face amount of the claim surrendered and further that "the bearer of this Certificate will be entitled to receive whatever further distribution, if any, of the Common Stock * * * of said Railroad Company may be authorized by the District Court of the United States for the District of Connecticut in said proceedings in respect of said amount of allowed unsecured claim." Thus, these certificates constituted a device to carry into effect the basic provision of the Plan as embodied in the Final Decree and Consummation Order whereby the entire common stock of the reorganized New Haven should be allocated to unsecured creditors, *pro rata*, in proportion to the amounts of their respective claims as finally allowed. This right of participation vested in unsecured creditors upon entry of the Final Decree and Consummation Order. For those whose claims had been finally allowed prior to the Consummation Order, their rights were partly satisfied by the initial distribution of the new common stock. For those whose claims were then undetermined, jurisdiction was reserved thereafter to determine and allow their claims and thereupon order a distribution to each, out of the common stock reserved, of an amount of the common stock equal in par value to the amount of its claim, thereby bringing the treatment of each into parity with that accorded to claimants who had theretofore received the initial distribution. But all common claimants alike, by the Final Decree and

2. Since the gist of the Certificates of Interest is sufficiently indicated in the text of the opinion a reproduction of a specimen is not included in this publication.

Consummation Order were also vested with a right to share, *pro rata,* in so much of the stock reserved as should not be required to complete the initial distribution of $100 par value of stock on each $100 of claims as finally allowed.

To be sure, the amount of the stock which would be available for a final distribution to unsecured claimants necessarily could not be determined until all the unliquidated claims pending at the date of the Final Decree and Consummation Order had been determined by the exercise of the jurisdiction expressly reserved for that purpose by the Consummation Order as contemplated by the Plan. But by that Order, unsecured creditors who in return for the surrender of their claims received the initial distribution of stock and Certificates of Interest became entitled, *pro rata,* eventually to receive, upon surrender of their Certificates of Interest, the entire remainder of the stock reserved under Order 1016, except so much thereof as might be required for an initial distribution thereof to any of the three claimants for the adjudication of whose claims jurisdiction had been reserved. Thus, under the basic scheme, now to permit the Petitioner, who in parity with other unsecured creditors has already been accorded a right to receive $100 in par value of common stock on every $100 of its claim as allowed, an additional allotment, would be to impair rights which vested in the other unsecured creditors under the Consummation Order. The allowance of the pending petition would substantially reduce the amount of the new stock to which holders of Certificates of Interest are legally entitled. In legal effect, the holders of the certificates are junior lienors on a fund of stock which under the Final Decree was subject only to prior liens in favor of claims or potential claims of the Secured Sixes, the Boston Terminal Company Trustee and the Boston and Providence.

To bring down to date the history of the reserved stock, it can be stated that early in the post-consummation period the claim of the Secured Sixes was discharged without need to draw upon the reserved stock. The Boston Terminal claim was liquidated by settlement in the amount of $7,577,500 by an order of this court dated March 2, 1951, whereby out of the reserved stock 75,775 shares with certificates of interest in the face amount of $7,577,500 were distributed. Thus, of the unliquidated claims for the adjudication of which jurisdiction was reserved, only that of the Boston and Providence remains outstanding. And I am informed that a Plan of Reorganization for the Boston and Providence is pending in the United States District Court for the District of Massachusetts whereby its claim against the New Haven estate will be settled on such terms as not to require any distribution of New Haven common stock from the block thereof reserved under the New Haven Plan.

Consequently if that Plan for the reorganization of the Boston and Providence shall be approved and consummated, the entire remainder of the New Haven stock will become distributable, *pro rata,* to the holders of the outstanding Certificates of Interest which have been issued under the New Haven Plan. On that basis, the participating rights of Certificate Holders would be reduced by about 7% if the pending petition were granted. And even if the Boston and Providence reorganization should take such form that on an adjudication of its unsecured claim against the New Haven estate it should be entitled to some distribution of New Haven stock, the pending petition, if granted, would still substantially, though to somewhat less degree, impair the rights of certificate holders. That the impairment might be comparatively slight, is irrelevant, In re Peyton Realty Company, 3 Cir., 148 F.2d 771.

Thus ever since the Final Decree and Order of Consummation the holders of Certificates of Interest, in their dealings, have been entitled to rely upon their

**564**

right to participate in the distribution of a block of New Haven common stock, the available amount of which was subject to reduction only by possible allowances of the three claims above described which, as of the Consummation date, were the only unliquidated claims for which provision was contemplated by the Plan and accomplished by the Final Decree and Consummation Order. And the record shows that throughout the period there have been active dealings in the Certificates.

It is irrelevant for present purposes that certificate holders in their dealings may not have fully understood the complicated basis of their rights or the precise measure of their respective rights. Yet even as to this it may bè noted that one of the largest certificate holders,— Connecticut Railway and Lighting Company, a large unsecured creditor who appeared in opposition to this petition, was so sensitive to any proposed encroachment upon the fund of common stock reserved that it opposed in this court the settlement of the Boston Terminal Company claim: only by mandate of the appellate court was the settlement finally approved. Connecticut Railway and Lighting Co. v. New York, New Haven & Hartford Railroad Co., 2 Cir., 190 F.2d 305. The opposition of that respondent to that settlement and the resulting distribution of stock was overruled because that distribution was one authorized by the approved Plan and Consummation Order. The distribution now sought in behalf of Delaware is wholly without sanction in the Plan or Order.

I conclude, therefore, that the intervening rights of the holders of the Certificates of Interest, quite apart from other considerations, is ground requiring a dismissal of the petition.

It Is Accordingly Forthwith

Ordered that the petition be, and it hereby is, dismissed.

